**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| RENAY LYNCH,<br><br>                              Plaintiff<br><br>              v.<br><br>The TOWN OF AMHERST, Estate of John B. Askey, Michael J. Melton, Joseph LaCorte, Raymond Klimczak, and the COUNTY OF ERIE, et al.,<br><br>                              Defendants. | **FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No. 25-cv-75 (LJV)(JJM)** |

Plaintiff Renay Lynch ("Plaintiff" or "Ms. Lynch"), by her attorneys Fisher & Byrialsen PLLC, Beldock Levine & Hoffman LLP, and Newirth Linehan PLLC, as and for her First Amended Complaint against the Defendants alleges as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought by Plaintiff Renay Lynch who spent over twenty-seven years wrongfully imprisoned or on parole for the murder of Louise Cicelsky; a crime Ms. Lynch did not commit.

2.      In May 1995, Louise Cicelsky, a local landlord, was found murdered in her own home, an apartment within a multifamily building that she owned with tenants residing above and below her. The murder was the first in Amherst, New York that year and garnered significant media attention.

3.      Though the Detectives initially focused on suspects with known disputes with Ms. Cicelsky over property and money, they failed to fully resolve these leads.

1

4. Unable to solve the crime, police turned to Ms. Lynch—who was known to the Town of Amherst Police Department ("APD") as a vulnerable person addicted to drugs—in order to support their baseless theory that someone she knew had committed the murder.

5. Ms. Lynch had been the victim of repeated domestic violence at the hands of a partner who had introduced her to drugs. She soon became addicted. Her struggles with addiction led her to engage in petty crimes to support her habit, herself, and her children. At the time of the Cicelsky murder, Ms. Lynch was a convicted felon, but all her convictions were for non-violent crimes.

6. Her situation left her in the perfect position to serve as a useful informant for police, as she was susceptible to their promises of assistance and highly motivated to cooperate with demands from law enforcement—no matter what they were. Ms. Lynch's life circumstances—known by Defendants—made her particularly vulnerable to coercion and threats by corrupt police officers.

7. After an eighteen-month investigation into the murder without any arrests, Defendant Joseph LaCorte and Defendant Raymond Klimczak used improper interrogation techniques to coerce a false confession from Ms. Lynch. The coerced false confession implicated not just Ms. Lynch, but also an acquaintance by the name of Kareem Walker. Despite no physical evidence or eyewitnesses connecting Ms. Lynch or Mr. Walker to the crime, and significant discrepancies between Ms. Lynch's coerced false confession and the objective facts, Ms. Lynch was convicted of felony murder based on her false "confession."

8. However, Mr. Walker was never charged because, prior to Ms. Lynch's trial, Defendant Detectives and the Erie County District Attorney ("ECDA") determined he was in

Florida at the time of the murder. Defendant Detectives and the ECDA suppressed this exculpatory evidence from Ms. Lynch.

9.    Walker's absence from the jurisdiction at the time of the crime entirely contradicted the police theory of the case: that Mr. Walker and Ms. Lynch entered Ms. Cicelsky's home and Mr. Walker killed Ms. Cicelsky. It also contradicted Ms. Lynch's false confession.

10.    The fact of Walker's absence from New York State at the time of the Cicelsky murder was hidden from Ms. Lynch prior to, during, and after her 1998 trial—including during her years of post-conviction litigation—and was first revealed by Defendant LaCorte during a 2010 episode of a television show called *Women Behind Bars*. This exculpatory evidence was also hidden from all factfinders, including courts, the Grand Jury, and the trial jury, throughout the pendency of the case.

11.    Additional critical and exculpatory evidence was withheld from Ms. Lynch before, during, and after her trial and from all factfinders. In the immediate aftermath of the crime, the Amherst Police Department's analysis of fingerprints obtained from probative locations inside the victim's home directly implicated another man—"Suspect C." Suspect C was Ms. Cicelsky's downstairs tenant who had a violent history—including convictions for robbery and manslaughter. That Suspect C's fingerprints were found in probative locations in Ms. Cicelsky's house was not only suppressed from the defense, courts, and juries, Defendant officers offered false testimony during Ms. Lynch's trial to cover up the existence of this exculpatory evidence.

12.    An extensive re-investigation of Ms. Lynch's conviction by Ms. Lynch's post-conviction attorneys has unearthed what Ms. Lynch has always said: she was and has always been innocent of the murder of Ms. Cicelsky.

13.     Ms. Lynch asserts claims against the Town of Amherst ("Amherst"), based on and arising out of the wrongful acts and omissions of the APD and APD Police Chief John B. Askey, APD Captain Michael J. Melton, APD Lieutenant Joseph LaCorte, and APD Detective Raymond Klimczak, seeking relief for the violation of her rights secured by 42 U.S.C. § 1983 and of her rights secured by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the New York state Constitution, and New York state law.

14.     Ms. Lynch also asserts claims against the County of Erie based on and arising out of the wrongful acts and omissions of the ECDA, seeking relief for the violation of her rights secured by 42 U.S.C. § 1983 and of her rights secured by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the New York state Constitution, and New York state law.

15.     This miscarriage of justice was the direct result of egregious misconduct by the detectives who investigated Louise Cicelsky's murder as well as the prosecution that covered up the detectives' misconduct and persisted in the malicious prosecution.

16.     The investigation into the murder of Louise Cicelsky by the APD and ECDA's Office is a textbook example of governmental misconduct. At best, these offices ignored or, at worst, knowingly concealed material objective evidence that evinced the falsity of Ms. Lynch's coerced confession in order to close the investigation into Ms. Cicelsky's death by any means.

17.     Additionally, the ECDA's Conviction Integrity Unit (the "CIU"), which was involved in the reinvestigation of Ms. Lynch's conviction, knew that Ms. Lynch could not have committed the crime. Yet the ECDA and the CIU continue to deny Ms. Lynch access to the courts by refusing to acknowledge Ms. Lynch's exoneration.

18.     Ms. Lynch was stolen from her children because of the Amherst Police Department's intentional and/or negligent conduct in failing to turn over critical probative evidence that would have exonerated Ms. Lynch from the crime in 1995.

19.     As a result of these wrongful acts, Ms. Lynch was wrongfully arrested for and convicted of the murder of Ms. Cicelsky and spent over twenty-five years in prison and jail and just short of two additional years on parole.

20.     Ms. Lynch now seeks to hold the Defendants liable for the wrongs she grievously suffered; for the 27 years imprisoned or on parole, the physical and emotional toll such imprisonment has caused her and her family to endure, and for the emotional distress she continues to suffer to this day.

**JURISDICTION**

21.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

22.     Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

**COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW**

23.     Plaintiff served a Notice of Claim upon the Town of Amherst on April 2, 2024, within ninety days of the events giving rise to her claims.

24.     Plaintiff served a Notice of Claim against the County of Erie on April 2, 2024, within ninety days of the events giving rise to her claims.

25.     On October 1, 2024, Plaintiff appeared for an examination pursuant to section 50-h of the New York General Municipal Law.

26.    More than thirty days have elapsed since Plaintiff served her Notices of Claim and neither the Town of Amherst nor the County of Erie have offered adjustment or payment thereof.

## VENUE

27.    Venue is proper in the United States District Court for the Western District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place.

## JURY DEMAND

28.    Plaintiff demands a trial by jury in this action on each and every one of her claims for which a jury trial is legally available.

## PARTIES

29.    Plaintiff Renay Lynch is an African American citizen of the United States and the State of New York. At all times relevant to this Complaint, Ms. Lynch was a resident of the State of New York, City of Buffalo, and County of Erie.

30.    Defendant Town of Amherst ("Amherst") is a municipal entity created and authorized under the laws of the State of New York. Amherst is authorized by law to maintain a police department and does maintain the Amherst Police Department ("APD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Amherst assumes the risks incidental to the maintenance of a police force and the employment of police officers including, upon information and belief, through a contractual agreement with the Amherst Police Department Club, Inc.

31.    Defendant John B. Askey was at all times relevant to this Complaint the duly appointed and active Chief of the APD acting under color of law and in his individual capacity

within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Amherst and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-j and by contract. He is being sued in his individual capacity by and through his estate.

32. Defendant Captain Michael J. Melton was at all times relevant to this Complaint a duly appointed and active Captain of the APD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Amherst and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-j and by contract. He is being sued in his individual capacity.

33. Defendant Lieutenant Joseph LaCorte was at all times relevant to this Complaint a duly appointed and active Lieutenant of the APD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes ordinances, regulations, policies, customs, and usage of the Town of Amherst and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-j and by contract. He is being sued in his individual capacity.

34. Defendant Detective Raymond Klimczak was at all times relevant to this Complaint a duly appointed and active Detective of the APD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the Town of Amherst and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-j and by contract. He is being sued in his individual capacity.

35.    Defendant County of Erie (the "County") is a municipal corporation of the State of New York. The Erie County District Attorney's Office is an agency of the County for whose torts the County is responsible.

## STATEMENT OF FACTS

### I.    Renay Lynch

36.    In May of 1995, Renay Lynch was living in an apartment she rented on Lisbon Street, Buffalo New York, with her 15-year-old son and 13-year-old niece.

37.    At that time, Ms. Lynch was unemployed and battling drug addiction. She received Social Security Disability assistance for her drug addiction and public assistance for her son, while her sister provided her funds for taking care of her niece.

38.    When circumstances or her battle with addiction left her short of funds, Ms. Lynch engaged in larceny, typically of luxury clothing, to support herself and her children. Ms. Lynch has never been engaged or involved in violent crime.

39.    Ms. Lynch began renting the Lisbon Street apartment in December of 1994, from Louise Cicelsky. Ms. Cicelsky was 82 years old and owned several properties in the area.

40.    Ms. Lynch and Ms. Cicelsky quickly became friends and spoke frequently.

41.    Ms. Lynch visited and spoke with Ms. Cicelsky several times at her apartment on Longmeadow Road, Buffalo, New York, when she went to pay her rent, and on at least one occasion sat down and shared a meal with Ms. Cicelsky at her apartment. Ms. Cicelsky also visited and spoke with Ms. Lynch at her Lisbon Street apartment several times.

42.    Ms. Cicelsky was aware of Ms. Lynch's struggles with substance abuse and was understanding and supportive of her.

43.     For example, when Ms. Lynch was short on her rent one month, Ms. Cicelsky allowed her to pay the balance when she had obtained the funds, which Ms. Lynch did.

## II.    The Amherst Police Department's Investigation of Ms. Cicelsky's Murder

### A.  The Initial Crime Scene Investigation

44.     Defendants Melton, LaCorte, Klimczak, and other APD Officers responded to Louise Cicelsky's apartment in a multifamily building she owned in Amherst, New York, shortly after noon on Friday, May 19, 1995.

45.     Ms. Cicelsky's niece had discovered the body of Ms. Cicelsky, which was lying in the archway between her kitchen and dining room in a pool of blood.

46.     Ms. Cicelsky had been stabbed eight times in the neck, had bruises on her left eye and jaw, and one of her front teeth had been knocked out.

47.     The cause of death was determined to be exsanguination from the stab wounds on the neck.

48.     On Ms. Cicelsky's body was a gold wedding ring, a gold bracelet, and a wristwatch.

49.     In the vicinity of her body were three purses and a wig with a piece of torn telephone handset cord.

50.     An envelope containing $400 was found in the kitchen cupboard.

51.     Ms. Cicelsky's bedroom showed no signs of disturbance, but dresser drawers were slightly pulled open.

52.     Her spare bedroom also showed no signs of disturbance, but a purse on the spare bed had bloodstains on the inside flap and on a torn piece of telephone handset cord that was inside the purse.

53.   A dresser in the spare bedroom had a bloodstain on it that appeared to be a fingerprint.

54.   Inside the spare bedroom dresser were two envelopes containing a total of $1,143 and three credit cards.

55.   APD Officers had Ms. Cicelsky's daughter do a walkthrough of the apartment to determine if anything was missing.

56.   Ms. Cicelsky's daughter noted that her mother's wallet was missing but considered everything else to be in order.

57.   The daughter subsequently advised APD Officers that she believed two of Ms. Cicelsky's rings were also missing.

58.   APD Officers photographed the crime scene and processed it for evidence, including fingerprints and DNA evidence.

59.   The items that were tested for DNA all matched the profile of Ms. Cicelsky; however, some of the forensic evidence, including swabs of blood from the kitchen floor and from a piece of phone coil cord, did contain foreign alleles that, at the time, were insufficient to produce results.

60.   According to the trial testimony of APD Officers, including Defendant Melton, only two palm prints were recovered from the common hallway leading to Ms. Cicelsky's apartment.

**B. Ms. Lynch Learns of the Murder of Louise Cicelsky**

61.   On the afternoon of May 19, 1995, Ms. Lynch was home at her Lisbon Street apartment when her sister called and told her that there was a large police presence at the building

on Longmeadow Road where Ms. Cicelsky lived and that the area had been enclosed with crime scene tape.

62. The news naturally caused Ms. Lynch to worry that something bad had happened to Ms. Cicelsky.

63. Ms. Lynch called Ms. Cicelsky's phone number to see if she was alright.

64. She was surprised when an intimidating male voice answered the phone.

65. Previously, Ms. Cicelsky's phone had always been answered by Ms. Cicelsky, herself.

66. Ms. Lynch asked to speak to Ms. Cicelsky, and the intimidating male demanded to know who was calling. Ms. Lynch again asked to speak to Ms. Cicelsky, and the male again demanded to know who she was and why she was calling.

67. Now certain that something was wrong, Ms. Lynch told the male that she was Ms. Cicelsky's niece and that she was calling to see if Ms. Cicelsky was alright.

68. At the request of the intimidating male, Ms. Lynch provided her correct name, phone number, and address.

69. The intimidating male said someone would be by to see her and ended the call.

70. A short while later, Defendant LaCorte and another APD Detective arrived at Ms. Lynch's apartment.

71. The men identified themselves to Ms. Lynch as detectives and asked why she had called Ms. Cicelsky, among other questions.

72. The combination of what her sister had told her with the fact that detectives had answered Ms. Cicelsky's phone and had now come to ask about Ms. Cicelsky caused Ms. Lynch to believe something terrible had happened to Ms. Cicelsky, and she began to cry.

73.     Ms. Lynch explained to the detectives that she was a tenant and friend of Ms. Cicelsky, not her niece, and that she had called out of concern for Ms. Cicelsky's wellbeing after learning from her sister about the police presence and crime scene tape at Ms. Cicelsky's home.

74.     The detectives questioned Ms. Lynch, asking her when the last time was that she had seen Ms. Cicelsky and if she knew of anyone that Ms. Cicelsky had problems with.

75.     Ms. Lynch wanted to help the police and provided the detectives with as much information as she could.

76.     When the detectives finished questioning Ms. Lynch, they revealed that Ms. Cicelsky had been killed.

77.     Ms. Lynch was devastated to learn of her friend's murder.

C.  **Initial Reports to the Media**

78.     Ms. Cicelsky's murder was the first murder to occur in Amherst that year and was widely reported on by the news media.

79.     APD Officers reported to the media that Ms. Cicelsky was last seen alive on the morning of May 18, 1995, and that she could have been dead for more than 24 hours when her body was found at approximately noon on May 19, 1995.

80.     They reported that the apartment was "very neat," and nothing seemed to have been disturbed.

81.     APD Officers additionally told the media that they were planning to contact past and present tenants to see if anyone had a dispute with the victim and determine if she had rental money in her apartment.

**C.    Numerous Suspect Profiles Are Developed**

82.    Defendants LaCorte and Klimczak, among other APD Officers, interviewed friends, neighbors, and associates of Ms. Cicelsky in an attempt to determine who was responsible for the murder.

**a.  Kareem Walker**

83.    APD records show that Kareem Walker was one of the first persons that the APD suspected in Ms. Cicelsky's murder.

84.    Kareem Walker was a 19-year-old with a criminal history in Florida who drove a white Cadillac.

85.    APD records show that Mr. Walker's fingerprints were the first set of fingerprints the APD compared against fingerprints found at the crime scene.

86.    The comparison produced negative results.

87.    Nonetheless, APD Officers set about trying to locate Mr. Walker.

88.    Defendant Klimczak, among other APD Officers, eventually learned from Ms. Lynch that she knew Mr. Walker and that Mr. Walker had driven her to Ms. Cicelsky's on one occasion.

89.    Defendants Melton, LaCorte, and Klimczak, and other APD Officers, extensively researched Mr. Walker, interviewed persons likely to have knowledge about Mr. Walker's activities, visited locations purportedly associated with Mr. Walker, and conducted stakeouts of locations Mr. Walker was known to frequent, all with negative results.

### b. Suspect A

90.    Ms. Cicelsky's family and personal attorney advised the APD that they suspected a man, "Suspect A," with whom Ms. Cicelsky had a bitter dispute over a property that she had sold him.

91.    Over the two years prior to the murder, Suspect A had fallen behind on his payments for the property and Ms. Cicelsky had initiated foreclosure proceedings against him.

92.    Suspect A and Ms. Cicelsky's lawyers had recently reached an agreement that Ms. Cicelsky would stop the foreclosure proceedings if he paid a modest portion of the money he owed by April 30, 1995, but April 30, 1995, came and went without a payment from Suspect A.

93.    As a result of Suspect A's non-payment, Ms. Cicelsky caused all of the locks on the property to be changed, which upset Suspect A.

94.    Ms. Cicelsky's lawyers drew up papers and arranged for Suspect A to sign over the deed to the property to Ms. Cicelsky, which would have caused Suspect A to lose $20,000 on his investment.

95.    On May 18, 1995, the day APD Officers believed the murder took place, Ms. Cicelsky's lawyer called Suspect A to check on his progress in completing the papers for the deed transfer.

96.    When police first tried to locate Suspect A on the day they discovered the victim's body, they could not find him.

97.    They learned from the manager of his office building that Suspect A was also behind on his office rent and that both his home and work phones had been disconnected.

98.    When police located Suspect A, he denied seeing Ms. Cicelsky at all within the last year, but admitted that she was constantly "bugging" him by calling.

14

99.    Yet neighbors who lived across the street from the disputed property later told police they had seen Suspect A "watching" the victim on "numerous occasions."

100.    A person who did maintenance work and chores for Ms. Cicelsky told APD Officers that he would observe Suspect A park his car down the block and watch Ms. Cicelsky when she came to his house.

101.    Suspect A initially offered to provide his fingerprints and take a polygraph test, but later told the APD that he had retained a lawyer who would not allow him to provide his fingerprints or take the polygraph test.

102.    APD Officers created a special file for Suspect A.

103.    On May 30, 1995, APD Captain Gould met with APD homicide detectives and went over "all points referring to our suspect, [Suspect A]."

104.    On August 1, 1995, the Buffalo News reported that the APD had a suspect for Ms. Cicelsky's murder who knew Ms. Cicelsky from a real estate business dealing.

105.    In the article, Captain Gould complained that this suspect would no longer talk to the APD on the advice of his attorney and stated that the person would not have anything to worry about if they were innocent.

### c. Suspect B

106.    APD Officers learned that Ms. Cicelsky also had a dispute with her nephew, "Suspect B," who owed her $13,000.

107.    Ms. Cicelsky and Suspect B had been engaged in "extensive" litigation over the money he owed her.

108.    According to Ms. Cicelsky's housekeeper, Ms. Cicelsky hated Suspect B because she had lent him $10,000 and Suspect B would not pay her back.

109.     Ms. Cicelsky's housekeeper said Ms. Cicelsky called Suspect B frequently about the unpaid loan and called him names.

110.     APD Officers Gould and Wright interviewed Suspect B on May 20, 1995, and he told them that Ms. Cicelsky had been calling him daily and complaining about the money he owed her.

111.     Suspect B said that Ms. Cicelsky had called and left a voicemail message for him on May 18, 1995—the day APD Officers suspected the murder occurred.

112.     Suspect B provided a detailed alibi for May 18th and 19th, 1995, and told the APD Officers that he would provide his fingerprints and take a polygraph test.

113.     APD Officers subsequently took Suspect B's fingerprints and palm prints and compared them to those found at the crime scene with negative results.

### d.  Suspect C

114.     Suspect C was the basement tenant in Ms. Cicelsky's building.

115.     An upstairs tenant in the building identified Suspect C to APD Officers as a potential suspect, having been arrested weeks before.

116.     APD Officers became interested in Suspect C after they ran a background check on him and discovered that he had a criminal history that included manslaughter, robbery, and drug possession.

117.     Several individuals told APD Officers that they thought Suspect C was "suspicious."

118.     Defendant LaCorte, among other APD Officers, interviewed Suspect C multiple times, at length, about his background, his associates, his relationship with Ms. Cicelsky, and his activities around the time of the murder.

119.     During one of the APD interviews of Suspect C, APD Officers had Suspect C sign a document and noted that Suspect C was left-handed.

120.     On May 19, 1995, Suspect C told Defendant LaCorte and other APD Officers that he last saw Ms. Cicelsky at 7:15 a.m. on Tuesday, May 16, 1995.

121.     On May 22, 1995, in a follow up police interview just three days later, Suspect C told APD Officers that the last time he saw Ms. Cicelsky was on Thursday, May 18, 1995, between 4 and 6 p.m.

122.     On May 25, 1995, Suspect C told police he was "not sure whether he saw her on Tuesday or Thursday, the 17th."[1]

123.     According to police reports, Suspect C knew that tenants paid cash rent, that there might be cash in Ms. Cicelsky's apartment, and that Ms. Cicelsky always left the back door unlocked.

124.     While Suspect C told police that he had a good relationship with Ms. Cicelsky, other tenants described a rocky relationship, stating that Ms. Cicelsky had problems with Suspect C over late rent and parking.

125.     APD Officers also learned that Ms. Cicelsky had recently asked Suspect C to pay additional rent because his girlfriend had moved in with him and international calls had been made from his unit on a shared line.

126.     Approximately three weeks before the murder, Suspect C had been arrested for domestic violence after punching his girlfriend in the face.

127.     Other than the upstairs tenant, Suspect C was the last person who claimed to have seen Ms. Cicelsky alive.

---

[1] May 16, 1995 was a Tuesday; May 17, 1995 was a Wednesday; and May 18, 1995 was a Thursday.

128. Suspect C gave contradictory information about his contact with Ms. Cicelsky; but he did tell police that he saw and apparently spoke with her on Thursday, May 18, 1995, between 4 and 6 p.m., when he allegedly saw her pacing outside her home waiting for someone.

129. The officers noted that this statement was contradicted by a prior statement Suspect C had made.

130. Suspect C's statement was also contradicted by other witnesses, who did not see Ms. Cicelsky on Thursday evening.

131. Suspect C also provided APD Officers with a set of his finger and palm prints.

### e. Renay Lynch

132. Renay Lynch became a suspect in Ms. Cicelsky's murder investigation as a result of her calling Ms. Cicelsky's apartment shortly after the murder had been discovered and claiming to be Ms. Cicelsky's niece.

133. Defendants Melton, LaCorte, and Klimczak, and other APD Officers verified Ms. Lynch's explanation that she had called Ms. Cicelsky after learning from her sister about crime scene tape and a large police presence at Ms. Cicelsky's home.

134. Defendants Melton, LaCorte, and Klimczak, and other APD Officers subsequently returned to Ms. Lynch's home to re-question her after reviewing her arrest records, which revealed a criminal history with several larcenies, all non-violent.

135. Ms. Lynch truthfully answered the APD Officers' questions about her arrest records and again explained why she had called Ms. Cicelsky's apartment and said she was her niece.

136. APD Officers requested that Ms. Lynch provide them with her fingerprints and submit to a polygraph test.

137. On May 24, 1995, Ms. Lynch allowed APD Officers to take her fingerprints.

18

138.    Ms. Lynch's fingerprints were subsequently compared against fingerprints recovered from the crime scene with negative results.

139.    Defendant LaCorte informed Ms. Lynch that she was not a suspect in the murder but that he felt like someone in her circle of friends could be involved.

140.    Defendants Melton, LaCorte, and Klimczak, and other APD Officers frequently pursued and questioned Ms. Lynch in the hope that she would provide them with useful information regarding potential suspects and Kareem Walker.

## D.  The Cicelsky Murder Investigation Stalls

141.    In addition to the aforementioned suspects, APD Officers investigated numerous other persons they suspected could be involved with Ms. Cicelsky's murder.

142.    The investigation into Ms. Cicelsky's murder continued into 1996.

143.    Defendants Melton, LaCorte, and Klimczak, and other APD Officers continued investigating Suspect A and attempting to locate Kareem Walker.

144.    APD Officers also continued their attempts to develop other leads.

145.    For example, APD Officers including Defendant LaCorte looked into the criminal histories of people that had worked for Ms. Cicelsky in the past and, if they found someone with a criminal history, would question that person and request that they provide fingerprints and submit to a polygraph test.

146.    On April 3, 4, and 8 of 1996, Defendant Klimczak, among other APD Officers, made multiple unsuccessful attempts to locate Kareem Walker.

147.    After those unsuccessful attempts, APD records do not report any investigation activity in the Cicelsky murder investigation for approximately 6 months.

19

148. Six months later, on October 4, 1996, a friend of the Cicelsky family contacted APD Officers and requested an update on the Cicelsky murder investigation.

149. Although there had been no documented investigation activity for approximately 6 months, APD Officers responded that the case was being "actively investigated and that all avenues of information are being followed upon."

150. The Cicelsky family friend asked APD Officers about a rumor that they knew who committed the murder, but could not make an arrest due to "legal technicalities."

151. Upon information and belief, the subject of the rumor was Suspect A.

152. Upon information and belief, the "legal technicalities" were that Suspect A's lawyer would not allow him to be interviewed.

153. APD Officers responded that they could not comment on an active investigation.

154. The Cicelsky family friend advised APD Officers that the friend would keep in touch with APD because the friend "hadn't heard anything since the time of the investigation."

**E. APD Officers Unreasonably Focus Their Investigation on Kareem Walker**

155. After receiving the October 5, 1996, call from the Cicelsky family friend, Defendants Melton, LaCorte, and Klimczak, and other APD Officers took the path of least resistance and continued their attempts to locate Kareem Walker.

156. The APD Investigation records do not report that they continued to investigate Suspect A, Suspect B, or Suspect C.

157. Upon information and belief, APD Officers attempted to locate and contact Ms. Lynch to determine if she had obtained any information in the last six months that would help them locate Mr. Walker.

20

158.    On or about October 15, 1996, APD Officers learned that Ms. Lynch had been arrested and was facing the prospect of jail time for larceny charges.

159.    Upon information and belief, Defendants Melton, LaCorte, and Klimczak, and other APD Officers decided to use the prospect of jail time to coerce Ms. Lynch into obtaining information they could use to arrest Mr. Walker.

160.    On October 22, 1996, Defendants LaCorte and Klimczak approached Ms. Lynch at the Erie County Courthouse prior to her being sentenced and told her it would be "smart" for her to help them with their homicide investigation.

161.    Defendants LaCorte and Klimczak told Ms. Lynch that they knew Kareem Walker had murdered Ms. Cicelsky.

162.    Defendants LaCorte and Klimczak told Ms. Lynch that if she helped them obtain information connecting Mr. Walker to Ms. Cicelsky's murder, they could help her avoid jail time for her larceny charges.

163.    Although Ms. Lynch did not have any information that Kareem Walker was involved in the Cicelsky murder, she agreed to help Defendants LaCorte and Klimczak to avoid jail time for her recent larceny conviction.

164.    Defendants Melton, LaCorte, and Klimczak arranged for Ms. Lynch to wear a wire and be transported to places Mr. Walker's associates were known to frequent.

165.    Defendants Melton, LaCorte, and Klimczak instructed Ms. Lynch that she should obtain a recorded statement that would implicate Mr. Walker in the murder of Ms. Cicelsky.

166.    Before sending Ms. Lynch out with the wire, Defendants Melton, LaCorte, and Klimczak briefed Ms. Lynch on the kind of information they were looking for, which included information on the whereabouts of Kareem Walker.

167.    On October 29, 1996, APD Officers outfitted Ms. Lynch with a wire and began taking her to the locations that they knew were frequented by Mr. Walker.

168.    Over the next several days, Defendants Melton, LaCorte, and Klimczak, and other APD Officers continued to direct Ms. Lynch to talk to associates of Mr. Walker while wearing a wire.

169.    Ms. Lynch did not obtain any information connecting Kareem Walker to the murder of Ms. Cicelsky.

170.    Ms. Lynch did obtain information that Mr. Walker had returned to Florida and was possibly in jail there.

171.    Defendants Melton, LaCorte, and Klimczak, and other APD Officers confirmed that Mr. Walker was in Florida.

172.    Although they had not obtained any evidence that would reasonably cause them to believe that Mr. Walker had murdered Louise Cicelsky, upon information and belief, Defendants Melton, LaCorte, and Klimczak, and other APD Officers decided to charge Kareem Walker for that crime.

173.    On November 6, 1996, Defendants Melton, LaCorte, and Klimczak, and other APD Officers attempted to coerce Ms. Lynch into providing them with a statement implicating Mr. Walker with Ms. Cicelsky's murder.

174.    Defendants LaCorte and Klimczak insisted to Ms. Lynch that they knew Mr. Walker was responsible for Ms. Cicelsky's murder and threatened to cause Ms. Lynch to be returned to jail if she did not cooperate with them by providing them with a statement implicating Mr. Walker in Ms. Cicelsky's murder.

175. As a result of Defendant LaCorte's and Defendant Klimczak's coercion, Ms. Lynch agreed to provide false information implicating Mr. Walker in Ms. Cicelsky's murder.

176. Defendants Melton, LaCorte, and Klimczak, and other APD Officers prepared a statement which falsely claimed that, about one month after she returned from Atlanta in October 1995, Ms. Lynch ran into Mr. Walker who told her that he was in trouble and had to leave town because he had killed Ms. Cicelsky.

177. As a result of Defendants Melton's, LaCorte's, and Klimczak's coercion, Ms. Lynch signed the false statement.

178. Defendants Melton, LaCorte, and Klimczak, and other APD Officers then devised a ruse to lure Mr. Walker back to New York so that they could arrest him for the murder of Ms. Cicelsky.

179. Defendants Melton, LaCorte, and Klimczak demanded that Ms. Lynch make telephone calls to provide Mr. Walker with the false information that he had infected Ms. Lynch with HIV and requesting that he return to Buffalo so that Ms. Lynch could obtain benefits for people afflicted by the HIV virus.

180. As a result of Defendants Melton's, LaCorte's, and Klimczak's coercion, Ms. Lynch complied with the APD Officers' request and made telephone calls to provide Mr. Walker with the false information about having HIV and requesting that Mr. Walker return to Buffalo.

181. The APD Officer's ruse did not cause Mr. Walker to return to Buffalo.

182. Defendants Askey, Melton, LaCorte, and Klimczak, and other APD Officers subsequently learned that Mr. Walker was being held in custody in Florida while he awaited trial on charges that included kidnapping and burglary.

183.     Defendants Askey, Melton, LaCorte, and Klimczak, and other APD Officers additionally learned that Mr. Walker was in custody in Florida around the time of Ms. Cicelsky's murder and could not have been involved in the murder.

184.     At or about this time, Defendants Melton, LaCorte, and Klimczak, and other APD Officers learned that Ms. Lynch had been involved in the robbery of an expensive fur coat.

185.     On November 25, 1996, at approximately 1:00 p.m., Defendants LaCorte and Klimczak arrested Ms. Lynch for the robbery and brought her to the APD.

186.     Defendant LaCorte was enraged with Ms. Lynch because she "ma[de] [him] look bad" by stealing the coat while she was out on appeal bond because of his efforts so, he testified at trial, he acted "nasty" towards her

187.     While in custody, Ms. Lynch was visibly suffering severe withdrawal symptoms from previously using drugs and was in great physical distress.

188.     Defendants LaCorte and Klimczak understood Ms. Lynch was an addict struggling with intense withdrawal and desperate to leave the police precinct to obtain more drugs.

189.     Defendant LaCorte threatened Ms. Lynch with seven years of prison time for the theft of the fur coat but said that she would not be arrested if she helped them retrieve the coat.

190.     Desperate to alleviate her withdrawal symptoms and to stay out of jail, Ms. Lynch agreed to help retrieve the stolen coat.

191.     The stolen coat was subsequently recovered with Ms. Lynch's help.

192.     Despite his earlier promise that he would keep her out of jail if she recovered the coat, Defendant LaCorte told Ms. Lynch he was charging her for the stolen coat and that she would be in prison for several years.

24

193. Ms. Lynch had been in police custody for approximately 6 hours at this point and her sickness from withdrawal had significantly worsened.

194. Now Defendants Melton, LaCorte, and Klimczak told Ms. Lynch that she would be booked for the theft of the coat unless she gave them information about Ms. Cicelsky's murder.

195. Defendant LaCorte falsely told Ms. Lynch that they knew Walker committed this crime but that her November 6 statement—in which she placed Walker but not herself at the scene of the crime—would not be enough to arrest him as they "needed [her] to be there at the murder."

196. Defendants Melton, LaCorte, and Klimczak knew that Mr. Walker could not have committed the murder because he was in jail in Florida at the time.

197. Defendants LaCorte and Klimczak then showed Ms. Lynch gruesome crime scene photographs of her friend's murder and fed Ms. Lynch false information about how Mr. Walker had murdered Ms. Cicelsky.

198. Defendants LaCorte and Klimczak threatened, pressured, intimidated, and frightened Ms. Lynch into complying with their demands.

199. Defendant LaCorte was angry and aggressive, banging on the table and yelling at Ms. Lynch causing her to fear for her safety.

200. Defendants LaCorte and Klimczak threatened they would have Ms. Lynch charged with perjury and she would face another ten-to-fourteen-years in jail.

201. Defendants LaCorte's and Klimczak's pressure tactics overbore Ms. Lynch's will.

202. As a result of the Defendants' coercion, Ms. Lynch agreed to sign a "confession".

203. Defendants LaCorte and Klimczak prepared a statement that falsely claimed Ms. Lynch and Mr. Walker were attempting to rob Ms. Cicelsky when Mr. Walker murdered Ms. Cicelsky.

25

204.     In preparing the statement, Defendants LaCorte and Klimczak included details that had not been revealed to the public, such as the victim's wig having fallen off.

205.     Defendant Klimczak typed up the false "confession" that purportedly reflected what Ms. Lynch had said.

206.     The false confession drafted by Defendants claimed that, on the day of the planned robbery, Mr. Walker entered Ms. Cicelsky's home through the back door while Ms. Lynch entered from the front, and that Mr. Walker hit the victim twice, causing her to fall to the floor and her wig to fall off. The false confession claimed that while the victim was on the ground, Mr. Walker went into her bedroom and returned with money in his hand. According to the false confession, Ms. Lynch then ran out of the apartment through the front door and waited in Mr. Walker's car.

207.     No contemporaneous notes were made of Ms. Lynch's purported statements on either November 6 or November 25, nor were her interviews or interrogations audio or video recorded, though the APD had the means and opportunity to do so.

208.     Because of the coercion she had suffered and continued to suffer from Defendants, on November 25, Ms. Lynch signed the false confession statement Defendants LaCorte and Klimczak had prepared.

209.     Based on the false confession statement they had prepared and coerced Ms. Lynch to sign, Defendants Melton, LaCorte, and Klimczak falsely charged Ms. Lynch with the murder of Louise Cicelsky.

210.     Kareem Walker was never charged with any crime relating to Ms. Cicelsky.

## III.     Grand Jury Proceedings

211.     A grand jury was convened on or about June 9, 1997, to hear the case that Ms. Lynch had murdered Ms. Cicelsky.

26

212.    At the grand jury, Defendant LaCorte testified that Ms. Lynch had given him a written statement confessing that she and Kareem Walker had robbed Ms. Cicelsky and that Kareem Walker had murdered Ms. Cicelsky during the robbery.

213.    Defendant LaCorte did not tell the grand jury that he knew the "confession" could not be true because Kareem Walker was in jail in Florida at the time of Ms. Cicelsky's murder.

214.    Defendant LaCorte also did not tell the jury that the information in the typed "confession" had come from himself and Defendant Klimczak.

215.    While Defendant LaCorte testified to the grand jury that the typed "confession" contained facts that were unique to the crime scene and not publicly available, he did not tell the grand jury that he and Defendant Klimczak, and not Ms. Lynch, had caused those facts to be included in the confession statement.

216.    Defendant LaCorte also did not tell the grand jury that Ms. Lynch had only signed the false typed "confession" after hours of intimidation, false promises, and other police coercion.

217.    In fact, Defendant LaCorte told the grand jury that the information in the typed "confession" came from Ms. Lynch and that she provided it voluntarily.

218.    As a result of Defendant LaCorte's failure to provide the grand jury with the aforementioned information, the grand jury indicted Ms. Lynch with Ms. Cicelsky's murder.

## IV.    Ms. Lynch is Wrongfully Convicted for the Murder of Ms. Cicelsky

219.    The prosecution's theory at trial was that Ms. Lynch and Kareem Walker conspired to kill Ms. Cicelsky, and that Ms. Lynch went to Ms. Cicelsky's apartment with Mr. Walker to rob and kill her.

220.    Mr. Walker's involvement in the crime was thus necessary to the prosecution's felony murder theory against Ms. Lynch.

221.    Because no physical evidence or eyewitness testimony connected Ms. Lynch or Kareem Walker to the crime, the ECDA relied on Ms. Lynch's false confession as well as the testimony of an incentivized informant Raquel Hunter to establish her guilt.

222.    Because the prosecution knew well before Ms. Lynch's trial that Mr. Walker was out of state at the time of the crime, he was never arrested or charged with this crime.

223.    Despite their knowledge to the contrary, the prosecution nevertheless presented to every court and jury in the case the false narrative that Ms. Lynch and Mr. Walker conspired to kill Ms. Cicelsky, and did so during a robbery they executed together, during which time Mr. Walker killed Ms. Cicelsky.

224.    At trial, Defendant Captain Melton testified that there only two latent prints from the crime scene were suitable for comparison.

225.    He also testified at Ms. Lynch's trial that there were no "usable" prints obtained from inside the victim's home.

226.    As is provided for, *infra*, Defendant Melton's testimony was provably false.

227.    Ms. Lynch testified on her own behalf. She repeatedly disavowed her November 6 and November 25 statements.

228.    Ms. Lynch maintained her innocence and denied any knowledge of or participation in the robbery or murder of Louise Cicelsky.

229.    Finally, Ms. Lynch asserted that her confession was false and coerced.

230.    The testimony of incentivized jailhouse informant Raquel Hunter, who alleged Ms. Lynch confessed to her in June 1997 while they were both incarcerated, was also suspect, as described *infra*.

231. The ECDA trial prosecutor, Frank Sedita III, stated in his closing arguments that "no" fingerprints were found anywhere in the apartment and that "all the blood" was the victim's blood. As described, *infra*, these statements were knowingly false.

232. On February 18, 1998, Ms. Lynch was convicted of second-degree murder and robbery in connection with the 1995 homicide of Louise Cicelsky.

233. On April 9, 1998, Ms. Lynch was sentenced to twenty-five years to life.

234. Ms. Lynch was immediately incarcerated as of November 25, 1996, and remained so until her release on parole on January 27, 2022.

## V. Ms. Lynch Continues to Assert her Innocence While ECDA Continues to Suppress Evidence

235. Ms. Lynch consistently proclaimed her innocence before and after Defendants LaCorte and Klimczak coerced her false inculpatory statements.

236. For years, Plaintiff litigated and appealed her conviction to no avail.

237. In Ms. Lynch's appeals she argued, among other things, that her *Miranda* rights were violated when the Defendant Detectives coerced statements made about the murder while she was in custody on an unrelated charge of grand larceny.

238. After her conviction, ECDA continued to defend Ms. Lynch's conviction.

239. Until 2009, ECDA opposed all of Ms. Lynch's attempts to vacate her conviction and continued to suppress from and misrepresent to courts and Ms. Lynch the existence of critical, exculpatory evidence.

240. By 2009, all of Ms. Lynch's appeals, including one to the U.S. Supreme Court, failed.

**A.    Defendant LaCorte Publicly Admits that He and APD Knew that Kareem Walker Was Out of State at the Time of the Crime**

241.    Ms. Lynch's path to vindication finally opened when a critical admission was made by a member of the APD, Defendant LaCorte.

242.    A 2010 episode of a television show called *Women Behind Bars* featured Ms. Lynch's case. On the show, Defendant LaCorte admitted that the reason Kareem Walker was never charged was because "my partner looked into it and Kareem [Walker] was in Florida at the time of our crime."

243.    This was the first public admission that Kareem Walker could not have committed the murder and that investigating officers knew this prior to Ms. Lynch's trial.

244.    This admission finally explained why Mr. Walker had never been arrested, charged, or prosecuted for the crime.

245.    Defendants Melton, LaCorte, and Klimczak as well as, upon information and belief, prosecutors from the ECDA, suppressed from Ms. Lynch that they had ruled Walker out as a suspect well before Ms. Lynch's trial, rendering Ms. Lynch's coerced confession—and the prosecution's theory of the case at trial—impossible.

246.    Defendant LaCorte's televised admission caused post-conviction counsel for Ms. Lynch to begin reinvestigating her case.

**B.    Incentivized Informant Raquel Hunter Recants Her Testimony**

247.    The only evidence the prosecution offered at trial implicating Ms. Lynch other than her false confession was the testimony of an incentivized jailhouse informant named Raquel Hunter.

248.    Ms. Hunter testified at Ms. Lynch's trial that Ms. Lynch confessed to her in June 1997 while they were both incarcerated.

249.    Neither Ms. Hunter's testimony, nor her prior statements to police, contained any information about the crime that the police and prosecutors did not already know or believe to be true.

250.    All the information that Ms. Hunter claimed Ms. Lynch told her—including the victim's age and address, that she was stabbed, and that she had been robbed, was publicly reported in the news.

251.    At the time Ms. Hunter began cooperating with law enforcement, she had three pending A misdemeanor criminal charges in an unrelated case, which were reduced by the State to B misdemeanors in exchange for her testimony against Ms. Lynch.

252.    At trial, Ms. Hunter even admitted she was informing on Ms. Lynch "to help myself."

253.    Ms. Hunter's credibility was further undermined by evidence that she was a serial cooperator and received a deal in exchange for testifying against another individual on trial for murder that same week. Neither the deal nor the history of cooperation was disclosed to Ms. Lynch.

254.    During the post-conviction reinvestigation of Ms. Lynch's case, Ms. Hunter recanted her entire testimony.

255.    On January 25, 2017, Ms. Lynch's post-conviction counsel met with Ms. Hunter. Ms. Hunter told Ms. Lynch's attorney that, in an effort to be released early from prison, she lied to detectives about Ms. Lynch confessing to her and admitted that she fabricated the story using facts from newspaper stories about the crime. Ms. Lynch then signed an affirmation setting forth these facts.

C.    **Post-Conviction DNA Testing Excludes Renay Lynch and Kareem Walker from Crime Scene Evidence**

256.    The APD had collected a significant amount of DNA evidence, some but not all of which was forensically tested in 1997.

257.    No physical evidence ever linked Ms. Lynch or Kareem Walker to the crime.

258.    At the time of the initial investigation, DNA testing was done on samples of some of the blood evidence collected at the scene and that blood matched the victim, Ms. Cicelsky.

259.    Approximately 45 items of forensic evidence were collected from the crime scene and sent to the Department of Central Police Services Forensic Laboratory for testing. Of those almost 45 items, 13 were tested for DNA.

260.    Fingernail clippings and scrapings obtained from the victim were never tested, nor was all of the blood spatter at the scene tested.

261.    Of the items that were tested, all matched the DNA profile of Ms. Cicelsky.

262.    Three pieces of evidence—namely swabs of blood taken from the kitchen floor and a piece of phone coil cord—contained foreign alleles that, at the time, contained a quantity too small to test at the time.

263.    On July 3, 2017, Ms. Lynch filed a motion pursuant to New York's CPL § 440.10(1)(g-1) seeking an order authorizing the testing of a number of items found at the crime scene including, but not limited to, swabs of blood from the scene and hairs from the carpet where Ms. Cicelsky was found.

264.    At the argument on the motion, Ms. Lynch's post-conviction counsel also sought further testing of latent fingerprints from the crime scene.

265.    In support of these requests, Ms. Lynch argued that there was a "reasonable probability" of a more favorable result, given flaws in the APD's investigation, the impossibility

32

of the prosecution's theory, as evidenced by Defendant LaCorte's public admission that Walker was out-of-state at the time, and Ms. Hunter's recantation.

266. ECDA opposed Ms. Lynch's motions, continuing to argue Ms. Lynch's guilt while admitting, finally, that Walker was not involved in the crime and could not have been involved due to his absence from New York State.

267. While finally admitting this fact, ECDA continued to suppress all of the aforementioned exculpatory evidence from Ms. Lynch and post-conviction courts.

268. On May 7, 2018, the Honorable M. William Boller, Acting Justice of the Supreme Court, granted Ms. Lynch's motion and ordered the requested testing.

269. Because male DNA was recovered from crime scene evidence, the Erie County District Attorney's Office sent an investigator to Florida to obtain a DNA sample from Kareem Walker for comparison purposes.

270. The evidence was transported by the office of John J. Flynn, District Attorney of Erie County to the Erie County Central Police Services Laboratory for testing.

271. On June 4, 2021, the Erie County Central Police Services Forensic Laboratory concluded that DNA re-testing confirmed that—other than Ms. Cicelsky's DNA—the only other DNA found at the scene was male DNA and that Kareem Walker was excluded as "a possible contributor" to the sources of that DNA.

272. The testing confirmed Ms. Cicelsky's DNA on the telephone cord and purses found at the scene. The only remaining DNA found was male.

273. Kareem Walker was excluded from all the male DNA profiles that were recovered from the crime scene evidence.

274.    All of the female DNA recovered from the crime scene was identified as belonging to Ms. Cicelsky, thus excluding Ms. Lynch as a contributor

**D.      Post-Conviction Litigation and Reinvestigation by Ms. Lynch's Legal Team Uncovers Suppressed, Exculpatory Evidence**

275.    During these post-conviction proceedings, Ms. Lynch's legal team obtained evidence for the very first time that made clear that the APD knowingly withheld exculpatory information that would have cleared Ms. Lynch of any involvement in the Cicelsky murder.

276.    In 2020, the Conviction Integrity Unit ("CIU") of the Erie County District Attorney's Office joined in Ms. Lynch's post-conviction counsel's reinvestigation.

277.    Attorneys from the CIU provided to Ms. Lynch and Matt Marvin, an independent certified latent print examiner, 14 digital images of fingerprints taken from the crime scene. Neither the existence of, nor the images of, these fingerprints had ever been previously disclosed to Ms. Lynch.

278.    Mr. Marvin completed a review of these prints and concluded that seven prints were suitable for comparison and would have been suitable for comparison during the 1995 investigation.

279.    Mr. Marvin concluded that latent prints found directly inside of Ms. Cicelsky's kitchen and the hallway to the bedroom where blood was found matched the downstairs neighbor: Suspect C. None matched Ms. Lynch or Kareem Walker.

280.    On November 8, 2020, Mr. Marvin traveled to Tonawanda, New York to conduct a search of the prints that were determined to be of value.

281.    While in Tonawanda, New York, on November 10, 2020, Mr. Marvin was given a CD produced for the first time 25 years after Ms. Lynch's prosecution.

34

282.    No information was provided about the source of the CD, where it had been kept for the past 25 years, why it was being provided at that time, or why it had never been provided before.

283.    The CD contained images of an additional ten latent prints collected from the crime scene.

284.    These fingerprints had been suppressed from Ms. Lynch for more than 25 years, were suitable for testing, and would have been suitable for testing at the time of Ms. Lynch's arrest. Mr. Marvin reviewed all of the produced prints, including the seven prints that had been submitted for database comparison in 1995, and found that two of the latent prints were found on a door jamb in the kitchen and both prints were confirmed to be prints of Suspect C.

285.    Additionally, based on the descriptions of the latent prints and crime scene photographs, the evidence indicates that Suspect C's prints were also found on the door jamb leading to the hallway to a guest bedroom where the bloody drawer and purse with a bloody flap were found.

286.    This was the room in which a drawer was found "slightly ajar".

287.    As a result, Ms. Lynch's legal team learned that fingerprint evidence excluded Ms. Lynch and Kareem Walker from being the source of prints within Ms. Cicelsky's apartment, but implicated Suspect C.

**E.    The Newly Discovered Evidence Proves Defendant Melton Knowingly Testified Falsely at Ms. Lynch's Trial**

288.    In addition to implicating Suspect C in Ms. Cicelsky's murder, this newly discovered evidence revealed that Defendant Melton knowingly testified falsely at Ms. Lynch's trial about the critical issue of the number of usable fingerprints obtained from the crime scene.

289. Specifically, Defendant Captain Melton falsely testified that there only two latent prints from the crime scene were suitable for comparison.

290. Defendant Melton also falsely testified at Ms. Lynch's trial that there were no "usable" prints obtained from inside the victim's home.

291. This testimony was false, and knowingly so.

292. This false testimony was made possible by the suppression of records that showed that more than two usable prints were obtained from the crime scene, specifically including inside the victim's apartment.

293. In fact, in August 1995, APD Officers submitted five prints—not two—to be compared against fingerprints maintained in a state database, in an effort to identify a suspect or suspects.

294. These prints were in fact compared.

295. Additional documentation suppressed from Ms. Lynch until after 2017 shows that at least nine fingerprints from inside the crime scene were also found, and that some if not all of these prints were "usable", i.e., comparable to known fingerprints.

296. In fact, records establish that Defendants compared Suspect C's prints on June 1, 1995, Ms. Lynch's prints on June 16, 1995, and Kareem Walker's prints on May 20, 1995.

297. It was APD's long-standing policy and practice since at least 1990 to issue reports for every latent print analysis done.

298. It was APD's long-standing policy and practice to require an officer requesting a print to submit a request for a latent print analysis.

299. And it was APD's long-standing policy and practice to create a written report regarding the findings of any latent print analysis, including whether there was or was not a match.

300. In one APD report issued in connection with the Cicelsky murder investigation, the APD provides a list of "all persons checked against latents from the scene."

301. APD Officers including Defendant Melton should have therefore issued latent print reports comparing the found prints against at least 23 suspects.

302. Nevertheless, only one latent print analysis report was ever issued and/or produced.

303. ECDA suppressed from the defense the existence of these additional latent prints at the crime scene, that they had been compared to a number of suspects, and that Walker and Ms. Lynch were excluded.

304. Upon information and belief, Detective Melton knew that many prints were suitable for comparison and that some even matched Suspect C's prints but knowingly lied under oath about these facts at trial.

305. This false testimony was made possible by the suppression of critical, exculpatory evidence. This false testimony also foreclosed avenues of cross-examination that might have revealed to the jury Suspect C's involvement or the corruption of the police investigation.

306. Instead, Sedita presented a false narrative consistent with the ECDA's false theory of the case—that Mr. Walker had killed Ms. Cicelsky in Ms. Lynch's presence.

307. Sedita also falsely represented to the jury and the trial court that there were "no fingerprints anywhere inside [the] apartment."

308. Moreover, as part of the re-investigation, on June 10, 2021, after Mr. Marvin, the independent fingerprint analyst, examined the fingerprint evidence and issued his report, the prosecution and defense jointly interviewed retired APD investigator Stephen Kasper who was one of the original fingerprint examiners in this case.

309. At the time of Ms. Lynch's arrest, Mr. Kasper was an APD Detective and Latent Print Examiner. By then, he had been with the APD for 21 years.

310. During the interview, Mr. Kasper stated that three prints from inside the victim's apartment were in fact suitable for comparison in 1995, not including the two palm prints found in the common hallway

311. Mr. Marvin confirmed that these prints matched the prints of Suspect C.

312. However, no fingerprints were provided to Ms. Lynch pre-trial, nor were any offered into evidence at her trial.

313. In fact, Defendant Melton testified at Ms. Lynch's trial that there were no fingerprints from the interior of the victim's apartment suitable for comparison.

314. Mr. Kasper has since confirmed that one of the prints was located in the kitchen leading to the bedroom and that it had clearly been analyzed by someone other than him in the APD.

315. In fact, red markings on the photographs of the prints reveal that, upon information and belief, Defendant Melton analyzed at least one print that placed Suspect C inside Ms. Cicelsky's kitchen near where Ms. Cicelsky's body was found.

316. Upon information and belief, the only person other than Mr. Kasper who would have the requisite training and experience to analyze latent prints for APD at the time was Defendant Melton.

317. Mr. Kasper only did one analysis in the case and that was a comparison to a latent palm print that matched Suspect C that was in the common hallway outside of Ms. Cicelsky's apartment.

318. These newly discovered records make clear that APD Officers including, but not limited to, Defendant Melton knew, prior to Ms. Lynch's trial, that latent prints from the crime scene, including within Ms. Cicelsky's apartment, were suitable for comparison.

319. None of the prints in the apartment or back common hallway were Ms. Lynch's or Kareem Walker's.

320. None of the prints revealed during the post-conviction period and described *supra* had been disclosed to Ms. Lynch prior to trial, despite their availability and exculpatory nature.

321. The suppression permitted Defendants LaCorte and Melton to provide false trial testimony.

322. The APD knowingly hid exculpatory evidence from Ms. Lynch at her trial, and for many years thereafter, that would have established Ms. Lynch's innocence and implicated Suspect C in the murder. The APD also misled factfinders about this in order to ensure Ms. Lynch's wrongful conviction.

F. **ECDA Failed to Disclose Exculpatory Material**

323. Consistent with the ECDA's unlawful practice, the ECDA suppressed evidence that was both material and favorable to Ms. Lynch.

324. The prosecution's professed theory of the case was that Ms. Lynch and Kareem Walker went to the home of Louise Cicelsky with the intention of robbing her and that, during the commission of this robbery, Mr. Walker killed Ms. Cicelsky.

325. Consistent with the ECDA's unlawful practice, Sedita argued in both his opening and closing arguments that Walker stabbed Ms. Cicelsky.

326.    When the Sedita made these arguments, he knew they were false given that Defendants LaCorte and Klimczak had established prior to Ms. Lynch's trial that Mr. Walker was, in fact, in Florida at the time of the crime.

327.    Moreover, on May 20, 1995, the Defendant Detectives compared Walker's fingerprints to the latent prints collected from the crime scene, which were negative.

328.    Consistent with the ECDA's unlawful practice, Sedita also elicited false testimony from prosecution witnesses.

329.    For example, Sedita asked Defendant LaCorte why Kareem Walker was not arrested and Defendant LaCorte falsely testified that they "did not have enough evidence to arrest Kareem [Walker]" because he could not "arrest someone solely on the testimony of an accomplice."

330.    Defendant LaCorte's testimony was knowingly false.

331.    At the time he testified, Defendant LaCorte knew that Walker was in Florida at the time of the murder and could not have been involved in the crime.

332.    Consistent with the ECDA's unlawful practice, Sedita did not correct Defendant LaCorte's false testimony.

333.    Sedita also falsely stated in his closing argument that the only blood found in the apartment was "the victim's blood." This was knowingly false as Sedita knew that foreign alleles were reported in the DNA report.

334.    Additionally, at a 2018 hearing concerning post-DNA testing, a different ECDA assistant district attorney revealed that, prior to trial, detectives had conducted an investigation in Florida in 1997 that "ruled out" Kareem Walker as a suspect in the robbery and murder.

40

335.    At that hearing, the assistant district attorney inexplicably asserted that Ms. Lynch's motion for post-conviction DNA testing should have been denied because police knew Walker was not involved in the crime.

336.    She represented to the court that Detective Klimczak interviewed Kareem Walker in Florida and based on that interview, "they ruled him out as a suspect in 1997."

337.    Up until this point, the ECDA had suppressed the fact of this investigation, its conclusion, and any documents or evidence generated in the course of this investigation from Ms. Lynch for more than twenty years.

### G.    The Post-Conviction Reinvestigation Also Reveals the Destruction of Additional Exculpatory Material

338.    Through the reinvestigation process, it became clear that critical evidence has been, and remains, missing.

339.    For example, though parts of the APD investigation were documented in detail, at least fifty-four pages of entries were and remain unlawfully withheld or destroyed.

340.    Many APD officers did not type their own police log entries. As a result, and upon information and belief, many of the entries were made well after the actual police activity.

341.    Also unlawfully withheld or destroyed are fingerprint analysis reports comparing the latent prints found at the scene to a known list of suspects.

342.    In fact, Defendant Melton had analyzed at least one latent print which placed Suspect C within Ms. Cicelsky's kitchen and the hallway towards the bedrooms where a bloody purse was found, and both of which were in probative locations inside Ms. Cicelsky's apartment.

343.    Upon information and belief, Defendant Melton either knowingly destroyed or knowingly failed to create a fingerprint analysis report matching the print to Suspect C.

344. The unlawful suppression of this key, exculpatory evidence continued for decades —including throughout the reinvestigation and exoneration process.

345. The suppressed, exculpatory evidence also includes, but is not limited to, contemporaneous police reports from Ms. Lynch's November 25, 1996 interrogation that resulted in her false confession, fingerprint analysis reports and contemporaneous recordings of police activity, records reflecting that Kareem Walker was in Florida at the time of the murder and that this was discovered by Defendants LaCorte and Klimczak before Ms. Lynch's trial, among others.

346. Defendants, at best continue to withhold from Ms. Lynch and her attorneys or, at worst knowingly destroyed or knowingly refused to document, this critical evidence prior to Ms. Lynch's trial and throughout her efforts to overturn and vacate her conviction.

## H.   ECDA Agrees to Join Ms. Lynch's Motion to Vacate Her Conviction on the Condition That She Not Pursue Certain Claims, and then Publicly Disclaims Her Innocence

347. In 2020, ECDA's CIU agreed to cooperate with Ms. Lynch's post-conviction counsel in reinvestigating her claim of innocence.

348. As discussed *supra*, in connection with this reinvestigation, ECDA's CIU provided Ms. Lynch's counsel with exculpatory evidence, including the fingerprint evidence discussed *supra*, that had been suppressed from her for decades.

349. In addition, ECDA's CIU conducted interviews, including of Defendant police officers and other officers, which revealed misconduct in the investigation including *inter alia* suppression of exculpatory evidence and fabrication of inculpatory evidence.

350. During this period, Ms. Lynch's post-conviction counsel provided ECDA's CIU with substantial evidence supporting Ms. Lynch's claims of actual innocence.

351.    Despite all of the foregoing exculpatory evidence (much of which was suppressed by ECDA) and evidence of official misconduct in connection with the investigation of Ms. Cicelsky's murder and the prosecution of Ms. Lynch, as well as ECDA's acknowledgment at a 2018 hearing that it had known prior to Ms. Lynch's trial that Kareem Walker was out of state when Ms. Cicelsky was murdered, for years ECDA would not agree to join a motion by Ms. Lynch to vacate her conviction.

352.    Indeed, as described *supra*, for many years ECDA opposed all of Ms. Lynch's efforts to vacate her conviction.

353.    Although Ms. Lynch was released on parole in 2022, she remained committed to clearing her name by getting her conviction vacated.

354.    Finally, in March 2023, Ms. Lynch's post-conviction counsel submitted to ECDA a draft motion to vacate Ms. Lynch's conviction pursuant to CPL § 440.10(1)(b)[2], (g)[3] and (h)[4] together with a supporting affirmation and a memorandum in support.

355.    This motion and the supporting documents sought to vacate Ms. Lynch's conviction based on the foregoing newly discovered evidence, violations of Ms. Lynch's constitutional rights to *inter alia*, due process and a fair trial, and the fraud on the trial court as a result of the knowingly false testimony provided by Defendants LaCorte and Melton.

356.    Ms. Lynch's post-conviction counsel sought ECDA's support for Ms. Lynch's motion to vacate her conviction.

---

[2] CPL § 440.10(1)(b) allows a judgment to be vacated on the grounds that it was procured by "duress, misrepresentation, or fraud on the part of the court or prosecutor" or one working on the prosecutor's behalf.
[3] CPL § 440.10(1)(g) allows a judgment to be vacated upon the discovery of "new evidence . . . which could not have been procured by the defendant at trial even with due diligence."
[4] CPL § 440.10(1)(b) allows a judgment to be vacated on the grounds that it was obtained "in violation of a right of the defendant under the constitution of [New York] or the United States."

357. ECDA refused to join Ms. Lynch's motion to vacate her conviction unless Ms. Lynch removed all allegations except for those relating to the fact Suspect C's fingerprints were located in probative locations in the victim's apartment and that Defendant Melton testified falsely when he testified that the only prints suitable for comparison were found in a common hallway of the victim's apartment building.

358. ECDA further conditioned its support for Ms. Lynch's motion to vacate her conviction on Ms. Lynch moving for relief only under CPL § 440.10(1)(h)—not under subsection (1)(b) or (1)(g).

359. Ms. Lynch's attorneys attempted to reason with ECDA's representatives to ensure an accurate public record of the errors and official misconduct that led to Ms. Lynch's wrongful conviction.

360. ECDA informed Ms. Lynch's attorneys that they would not join her motion to vacate unless the requested changes were made.

361. Ms. Lynch ultimately complied with ECDA's demands and her post-conviction attorneys redrafted the papers supporting her motion to vacate her conviction to comport with ECDA's demands.

362. Ms. Lynch did this because, at age 68 and suffering serious health complications due to her nearly quarter century wrongful incarceration, she recognized this was the fastest and most certain route to a full exoneration.

363. Ms. Lynch agreed to ECDA's demands despite wanting a full, public account of the errors and misconduct that led to her wrongful conviction.

364. The stripping of the (b) and (g) grounds—including the removal of all references to ECDA's misconduct—was the product of active negotiations personally directed by John Flynn.

44

Flynn communicated ECDA's conditions to Lynch's post-conviction counsel through an intermediary. Flynn would not consent to the inclusion of the prosecutorial misconduct claims. In an article published in March 2025, the intermediary recalled Flynn responding that the prosecutorial misconduct claims against a current state judge were "a bridge too far."[5] Flynn refused to consent to vacatur if the prosecutorial misconduct claims were included in Plaintiff's motion to vacate: "We're not going to consent to that. You want to blow the whole thing up? Or do you want to win?" *Id.*

365.   ECDA's insistence on these conditions had a direct and concrete effect on Lynch's motion. Lynch's attorneys had prepared an original motion that was approximately 73 pages in length. After the negotiations imposed by Flynn and his office, the filed motion was reduced to 29 pages. Frank Sedita III—the prosecutor whose misconduct was at the heart of the suppressed claims—was never named in the court record.. Only then did ECDA agree not to oppose her motion, clearing the path to Ms. Lynch's exoneration after 27 years of trying to prove her innocence.

366.   The consequence of Flynn's conditions extended beyond the judicial record. By requiring that the motion proceed on constitutional violation grounds only under CPL § 440.10(1)(h) and that the prosecutorial misconduct claims be excised, Flynn ensured that the vacatur entered by Justice Boller on December 11, 2023 would not establish the factual predicate—fraud, misrepresentation, or newly discovered evidence of the kind that implicates official misconduct under CPL § 440.10(1)(b) and (g)—that would have entitled Lynch to bring a claim under Court of Claims Act § 8-b ("Section 8-b") for her more than twenty-five years of wrongful

---

[5] *See* Ryan Kost & Oishika Neogi, When Conviction Integrity Units Exonerate the Innocent, Prosecutors Escape Blame, N.Y. Focus (Mar. 13, 2025), https://nysfocus.com/2025/03/13/conviction-integrity-units-failure-new-york-wrongfully-incarcerated/.

imprisonment. Lynch's ability to recover compensation from the State of New York through the Court of Claims was foreclosed as a direct result of the conditions Flynn imposed on her vacatur.

367.    By conditioning its non-opposition to Ms. Lynch's motion to vacate the wrongful conviction on her agreement not to include certain truthful claims, ECDA denied Ms. Lynch her constitutional rights, including, *inter alia*, the right to unfettered access to the courts.

368.    ECDA's conditions for vacatur also continued its ongoing pattern of precluding exculpatory evidence from the courts' consideration and misrepresenting to courts the quantum of evidence against a criminal defendant.

369.    On November 15, 2023, Ms. Lynch's post-conviction counsel filed a Motion to Vacate Conviction in the New York Supreme Court, pursuant to C.P.L § 440.10(1)(h) together with supporting documents that met ECDA's requirements.

370.    ECDA did not oppose Ms. Lynch's motion and filed an affirmation in accordance with this position.

371.    On December 11, 2023, Justice M. William Boller, Justice of the Supreme Court of the State of New York, County of the Erie issued a decision and order vacating Ms. Lynch's conviction on the basis that "material which may be deemed favorable to the defense was withheld"—specifically, information concerning multiple fingerprints at the scene was not disclosed by law enforcement to the prosecution and therefore the defense.

372.    Judge Boller noted that ECDA did not oppose Ms. Lynch's motion "on these specific grounds." Then, in January 2024, ECDA moved to dismiss the indictment in the interest of justice. That motion was granted on January 4, 2024.

373. On January 5, 2024, ECDA issued a press release announcing the dismissal of the indictment.[6] The press release contained the following false statement: "The other person's [Walker's] alleged participation was not corroborated and therefore he was never charged in connection with this crime."

374. In fact, as detailed *supra*, Mr. Walker's alleged participation was disproved well before Ms. Lynch's trial by the police investigation which established that Mr. Walker was out of state at the time of the crime. This was known to ECDA prior to Ms. Lynch's trial.

375. On January 5, 2024, District Attorney John Flynn held a press conference at which he falsely stated, "I am not exonerating Ms. Lynch, OK? I am not up here saying that she did not do this. That is not what happened here. I am saying that I do not have enough evidence to go forward 30 years later, and I am saying it would be a waste of taxpayer dollars to go forward 30 years later."[7]

376. This framing—prosecutorial resources rather than factual innocence—was irreconcilable with the facts Flynn's own office had long possessed and suppressed.

377. In a March 2025 article, Flynn responded to accusations that trial prosecutor Frank Sedita III had suppressed exculpatory information and presented false and misleading information at Lynch's trial by stating the ECDA had investigated the misconduct claims and could not substantiate them. Suppressing the prosecution's misrepresentations about Kareem Walker

---

[6] Erie County District Attorney's Office, "Erie County DA Flynn Moves to Dismiss Indictment Against Woman Convicted as Accomplice in 1995 Homicide" available at: https://www4.erie.gov/da/press/erie-county-da-flynn-moves-dismiss-indictment-against-woman-convicted-accomplice-1995

[7] Harold McNeil and Dan Herbeck, "DA says withdrawing murder indictment against Buffalo woman doesn't exonerate her; Innocence Project disagrees" The Buffalo News (Jan. 8, 2024) available at: https://buffalonews.com/news/local/crime-courts/da-says-withdrawing-murder-indictment-against-buffalo-woman-doesnt-exonerate-her-innocence-project-disagrees/article_5555f624-ac02-11ee-a7b5-030738138e21.html.

throughout the murder investigation and at trial, Flynn falsely stated that, "[t]here was no evidence at all that the prosecutor purposely said anything that was contrary to the information that he had."[8]

378.    Flynn's public denial of any evidence of prosecutorial misconduct is irreconcilable with his own office's conduct in these proceedings. At a hearing in January 2018, ECDA's own lawyers told a court that the police had traveled to Florida and "they ruled him out as a suspect in 1997"— a full year before Lynch's 1998 trial. That representation, made by ECDA in open court six years before Flynn's interview, directly contradicts the assertion that there was "no evidence at all" that Sedita suppressed exculpatory evidence and made and elicited information contrary to the facts he possessed. It is also directly contradicted by the circumstances surrounding ECDA's own conditions for supporting the vacatur: claims with no evidential support do not require suppression. Yet Flynn had directed that those very claims be stripped from Lynch's motion because those claims were, in his own words, "a bridge too far."

379.    ECDA made these false statements despite the abundant evidence of Ms. Lynch's innocence and suppressed exculpatory evidence, the existence of which was not contested by ECDA during the years that Ms. Lynch's post-conviction attorneys collaborated with the CIU.

## VII.    Ms. Lynch's Damages

380.    Plaintiff was unlawfully imprisoned from November 25, 1996 to January 27, 2022, spending 9,194 days (or 25 years, 2 months, and 2 days) incarcerated and spending from January 27, 2022 to January 5, 2024, or 708 days or 1 year 11 months and 9 days, on parole—all for a crime she did not commit.

---

[8] *See* Ryan Kost & Oishika Neogi, When Conviction Integrity Units Exonerate the Innocent, Prosecutors Escape Blame, N.Y. Focus (Mar. 13, 2025), https://nysfocus.com/2025/03/13/conviction-integrity-units-failure-new-york-wrongfully-incarcerated/.

381.    The injuries and damages sustained by Plaintiff arising from her unjust conviction and imprisonment include but are not limited to the following: loss of freedom; pain and suffering; physical injuries, including injuries from physical altercations with guards and other inmates, the worsening of injuries due to inadequate medical care, and the development of hypertension and high blood pressure; injuries from repeated sexual assault by guards; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income; humiliation, indignities, and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, social activities, travel, enjoyment, and expression. As a direct result of her unjust conviction and imprisonment, many of the effects of these injuries continue to this day and will continue into the future.

382.    Renay Lynch can never regain the twenty-five years of her life during which she was wrongfully incarcerated by the State of New York and the just under two years she spent on parole. During her incarceration, she suffered physical injuries that have left her frail and traumatized. She lost twenty-five years of life being a mother and, later, a grandmother.

383.    At a minimum, she deserves some measure of compensation for the time, opportunities, and experiences that were taken from her and the damages she has suffered and continues to suffer as a result.

## FEDERAL CLAIMS

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983
### Fourth and Fourteenth Amendment Malicious Prosecution
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

384.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

49

further alleges as follows:

385.   Defendants Askey, Melton, LaCorte, and Klimczak, with malice and knowing that probable cause did not exist to arrest Renay Lynch and to prosecute her for the murder of Louise Cicelsky, acting individually and in concert, caused Renay Lynch to be falsely arrested, charged, and prosecuted for those crimes, thereby violating Ms. Lynch's clearly established rights under the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures and to be free of prosecution absent probable cause.

386.   Specifically, these Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to Renay Lynch, her defense counsel, the courts, grand juries, and Ms. Lynch's trial jury, exculpatory facts that vitiated probable cause against Renay Lynch and would have impeached witnesses for the prosecution at trial. (*See, e.g.,* ¶¶ 173, 203-205, 245, 255, 284-87, 288, 318, 339-46). These Defendants also deliberately failed to conduct a constitutionally adequate investigation in light of evidence clearly pointing to Suspect C as responsible for Ms. Cicelsky's murder. (*See, e.g.,* ¶¶ 114-30, 259-60, 272, 277-287, 308-19 *supra*).

387.   These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Ms. Lynch's clearly established constitutional rights. No reasonable officer in 1995 through 1998 would have believed this conduct was lawful.

388.   Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in Ms. Lynch's favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

389.   As a direct and proximate result of these Defendants' actions, Ms. Lynch spent

twenty-five years wrongfully convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

390. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

391. Defendants Askey, Melton, LaCorte, and Klimczak, acting individually and in concert, deprived Renay Lynch of her clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial.

392. These Defendants deprived Ms. Lynch of her right to a fair trial by fabricating inculpatory evidence and intentionally using unduly suggestive interrogation procedures and/or direct suggestion and/or coercion to fabricate and obtain false witness statements inculpating Ms. Lynch. (*See, e.g.,* ¶¶ 162-209, 247-255 *supra*). These Defendants deprived Ms. Lynch of her right to a fair trial by withholding material exculpatory and impeachment evidence from her defense counsel and the Court. (*See, e.g.*, ¶¶ 245, 255, 284-87, 287, 318, 338-45 *supra*).

393. These Defendants deprived Ms. Lynch of her right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation. (*See, e.g.,* ¶¶ 162-209, 247-255, 259-60, 272, 277-287, 308-19 *supra*).

394. These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Ms. Lynch's clearly established constitutional rights. No reasonable officer in 1995 through 1998 would have

believed this conduct was lawful.

395.    Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in Ms. Lynch's favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

396.    As a direct and proximate result of these Defendants' actions, Ms. Lynch was wrongfully convicted and imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

### THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983
**Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("*Russo* Claim")**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

397.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

398.    Upon information and belief, following the initiation of Ms. Lynch's prosecution with the filing of a felony complaint, the court had to determine whether sufficient evidence existed to warrant holding Ms. Lynch for the action of a grand jury, and which would decide whether the evidence supported formally charging Ms. Lynch by indictment and binding her over for trial.

399.    Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was also required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain her release.

400.    Under New York law, the strength of the prosecution's case is a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

52

401.    Despite knowing this, Defendants Askey, Melton, LaCorte, and Klimczak withheld, or caused to be withheld, from Ms. Lynch, her lawyer, the court, and the grand jury, exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the prosecution's case.

402.    Had such evidence been timely disclosed, the charges against Ms. Lynch likely would not have survived the initial hearing or the subsequent determination by the grand jury, and/or the court would have released Ms. Lynch on her own recognizance or on a reasonable bail rather than denying her bail request at arraignment.

403.    The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Ms. Lynch to be unnecessarily and unreasonably deprived of her liberty.

404.    This conduct is shocking to the conscience.

405.    It violated Ms. Lynch's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

406.    By virtue of the foregoing, the Defendants Askey, Melton, LaCorte, and Klimczak are liable, pursuant to 42 U.S.C. § 1983, for the violation of Ms. Lynch's constitutional rights and her resultant injuries.

**FOURTH CAUSE OF ACTION**
**42  U.S.C. § 1983**
**Denial of Due Process and a Fair Trial**
**under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence Favorable**
**to the Defense ("*Brady* Claim")**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

407.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

408.    At all relevant times, Ms. Lynch had a right—under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S. 83 (1963) and its progeny—to timely disclosure to her by the prosecution, of all evidence in its possession, custody or control that was favorable to her defense, either because it tended to show her innocence, tended to impeach the credibility of the prosecution's witnesses against her, or both ("*Brady* material").

409.    In furtherance of this right, police officers, including Defendants Askey, Melton, LaCorte, and Klimczak had a duty to timely disclose, or to ensure the timely disclosure of, all potential *Brady* material to the ECDA so that it could decide what to disclose to the defense.

410.    These Defendants violated this duty by knowingly, willfully, intentionally, recklessly, and/or negligently failing to timely disclose numerous items of *Brady* material, including documents and unrecorded information, including but not limited to the material enumerated in ¶¶ 256-67, 303-07, 323-37, *supra,* and elsewhere in this Complaint, and by destroying and/or hiding their notes, logs, reports, and records.

411.    The undisclosed *Brady* material was material to the outcome of the trial at which Ms. Lynch was convicted. But for failure of Defendants Askey, Melton, LaCorte, and Klimczak to disclose or cause the disclosure of the *Brady* material, there is a reasonable likelihood that Ms. Lynch would have been acquitted or otherwise received a more favorable outcome to her trial.

412.    By virtue of the foregoing, the Individual Defendants are liable, pursuant to 42 U.S.C. § 1983, for the violation of Ms. Lynch's constitutional rights and her resultant injuries.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Denial of Right of Access to the Courts Under Article IV of, and the First and*
*Fourteenth Amendments to, the United States Constitution*
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

413.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

414.    At all relevant times, Ms. Lynch had a right—Article IV of, and the First and Fourteenth Amendments to, the United States Constitution—to access the courts.

415.    Defendants Askey, Melton, LaCorte, and Klimczak, acting individually and in concert, denied Ms. Lynch her right under Article IV and the First and Fourteenth Amendments to the United States Constitution to access to the courts.

416.    Specifically, these Defendants maliciously and deliberately undertook action to withhold and/or destroy evidence and prevent Ms. Lynch from obtaining evidence necessary to a meaningful defense, thereby hindering her efforts to pursue her innocence. These actions included, but are not limited to:

(a) Falsely testifying about the circumstances and nature of Ms. Lynch's false confession, thereby denying Ms. Lynch the ability to present evidence that the confession was coerced and involuntary;

(b) Failing to turn over exculpatory fingerprinting evidence collected during the APD investigation;

(c) Destroying or knowingly failing to create fingerprint analysis reports on the fingerprints collected during the APD investigation;

(d) Falsely testifying at trial that there were no usable prints from the interior of Ms. Cicelsky's apartment;

(e) Failing to disclose that Defendants were aware that Kareem Walker could not have committed the murder because he was in Florida at the time and preventing Ms. Lynch from obtaining records related to Defendants' discovery of this crucial fact; and

(f) Destroying or unlawfully withholding at least fifty-four pages of APD investigatory entries.

417.    These Defendants performed the above-described acts under the color of state law, intentionally, with deliberate indifference to Ms. Lynch's clearly established constitutional rights. No reasonable officer in 1995 through 1998 would have believed this conduct was lawful.

418.    Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in Ms. Lynch's favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

419.    As a direct and proximate cause of Defendants' actions, Ms. Lynch's repeated efforts to subsequently appeal her conviction, as described in ¶¶ 235-40, *supra*, were severely hindered in a manner that foreclosed her ability to pursue meaningful judicial remedies.

420.    As a direct and proximate result of these Defendants' actions, Ms. Lynch spent twenty-five years wrongfully convicted and imprisoned and suffered other grievous and continuing damages and injuries set forth above.

**SIXTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Denial of Right of Access to Courts**
*Against All Defendants*

421.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

422.    The right of access to the courts is a fundamental constitutional right, rooted in Article IV, the Petition Clause of the First Amendment, and the Due Process Clause of the Fourteenth Amendment.

423.    The Supreme Court has recognized that a plaintiff states a cognizable backward-looking access-to-courts claim where she demonstrates: (i) the existence of a nonfrivolous underlying cause of action, whether anticipated or lost; (ii) that the defendant's official acts caused the loss or material impairment of that cause of action; and (iii) a remedy that may be awarded as recompense but that is not otherwise available in a suit that could presently be brought. *Christopher v. Harbury*, 536 U.S. 403, 413–15 (2002). Each element is satisfied here.

424.    Plaintiff Lynch had a specific, non-frivolous, and highly meritorious claim for compensation under New York Court of Claims Act § 8-b, the Unjust Conviction and Imprisonment Act, which provides a damages remedy against the State of New York for persons who have been wrongfully convicted and imprisoned. Section 8-b requires, among other predicates, that the claimant's conviction have been vacated or reversed on a qualifying ground. Two of the three grounds in Lynch's draft motion independently satisfied that predicate: CPL §§ 440.10(1)(b) and (g). Erie County District Attorney John Flynn stripped both of these qualifying grounds from Lynch's motion, leaving only CPL § 440.10(1)(h), which does not, standing alone, satisfy the § 8-b predicate. Lynch's actionable wrongful imprisonment in New York State prisons spanned twenty-four years, from her conviction through her release on January 27, 2022. The § 8-b claim she was deprived of the right to bring was clearly meritorious.

425.    Lynch's ability to maintain that claim has been materially diminished or been foreclosed as a direct result of the manner in which the vacatur motion was structured, at Flynn's insistence.

426. Further, Ms. Lynch was deprived of the ability to secure a court finding, by clear and convincing evidence, that she is factually innocent of the crime, a prerequisite to prevailing in a Court of Claims action. Such a judicial declaration of Lynch's actual innocence is unavailable in her federal § 1983 action, and no other proceeding can restore the loss of this right.

427. In or around March 2023, Lynch's post-conviction counsel submitted a draft motion to vacate to the Erie County District Attorney's Office ("ECDA") seeking vacatur of Lynch's conviction under CPL §§ 440.10(1)(b), (g), and (h). Each ground was independently supported and purposeful:

(a) CPL § 440.10(1)(b)—vacatur based on "duress, misrepresentation, or fraud on the part of the court or a prosecutor"—was an independent qualifying ground for a claim under Court of Claims Act § 8-b. It would have created a court record expressly establishing that ECDA's predecessors had committed fraud upon the trial court by presenting fabricated evidence and suppressing exculpatory material—including the known, pre-trial evidence that Kareem Walker was out of state at the time of the murder of Louise Cicelsky—thereby satisfying the § 8-b predicate and entitling Lynch to pursue compensation from the State for her wrongful imprisonment;

(b) CPL § 440.10(1)(g)—vacatur based on newly discovered evidence—was also an independent qualifying ground for a claim under Court of Claims Act § 8-b. It would have established, on the record of a New York court, that Lynch's conviction rested on suppressed evidence of her innocence—including the Walker alibi evidence known to defendants before trial—thereby independently

satisfying the § 8-b predicate and opening a second avenue to compensation from the State; and

(c) CPL § 440.10(1)(h)—vacatur for constitutional violation—was also included but was, standing alone, insufficient to satisfy the § 8-b predicate and insufficient to make a complete public record of the misconduct that produced Lynch's wrongful conviction.

428.    Despite the legal and factual support for all three grounds, ECDA under DA Flynn refused to join or support Lynch's motion to vacate unless she agreed to remove all grounds and all allegations of misconduct except those relating to the fingerprint evidence of Suspect C and defendant Melton's false testimony about those prints. ECDA specifically required that Lynch proceed exclusively under CPL § 440.10(1)(h), and that the grounds under subsections (b) and (g) be excised from the motion entirely. Flynn's own words confirm the deliberate nature of these conditions. Working through an intermediary, Flynn told Lynch's counsel that his office would not consent to the prosecutorial misconduct claims.

429.    Flynn himself acknowledged in a published investigative article that he said, regarding the inclusion of ECDA and Sedita's misconduct: "We're not going to consent to that. You want to blow the whole thing up? Or do you want to win?" This demonstrates that the decision to excise the claims under CPL § 440.10(1)(b) and (g) was calculated to shield the ECDA and Flynn's predecessor, Frank Sedita III, from judicial accountability, at the cost of stripping Lynch's vacatur of the grounds that would have created the necessary judicial record to bring a claim pursuant to Section 8-b.

430.    As a result, the motion filed on November 15, 2023, and the vacatur entered by Justice Boller on December 11, 2023, proceeded on constitutional violation (CPL § 440.10(1)(h)) grounds only—the very grounds that do not satisfy the Section 8-b predicate.

431.    Lynch, then sixty-eight years old and suffering from serious health complications, was compelled to accept these conditions because at her age and in her condition she recognized that ECDA's support was the fastest and most certain route to release.

432.    Flynn acted with full knowledge that stripping both the (b) and (g) grounds and requiring exclusively CPL § 440.10(1)(h) would materially diminish or preclude Lynch's ability to recover from any court for her wrongful imprisonment. This would materially impair or permanently foreclose her right to maintain a claim under Court of Claims Act § 8-b, and prevent any judicial record of official misconduct beyond the narrow fingerprint issue, and prevent Lynch from receiving a judicial declaration of her innocence.

433.    On January 5, 2024—the day after the dismissal of the indictment—ECDA issued a press release under Flynn's authority that stated: "The other person's [Walker's] alleged participation was not corroborated and therefore he was never charged in connection with this crime." That statement was materially false. Kareem Walker's alleged participation in the murder of Louise Cicelsky was not merely "uncorroborated"; it was affirmatively disproved by the Amherst Police Department's own pre-trial investigation, which established that Walker was out of state—in Florida—at the time of the crime. That fact was known to defendants LaCorte and Klimczak before Lynch's trial, and by Sedita and other trial counsel, and suppressed. Critically, ECDA itself acknowledged at a hearing in 2018 that it had known prior to Lynch's trial that Kareem Walker was out of state when Louise Cicelsky was murdered. Flynn's press release characterizing Walker's non-participation as a mere absence of corroboration—rather than as an

affirmative finding of his out-of-state presence—was a deliberate misrepresentation. By publicly framing the Walker evidence in that fashion, Flynn obscured the true nature and extent of the prosecutorial misconduct, created a false official record on which subsequent courts and proceedings would rely, and impaired Lynch's ability to vindicate her rights and pursue civil remedies.

434. At a press conference on January 5, 2024, Flynn publicly stated: "I am not exonerating Ms. Lynch, OK? I am not up here saying that she did not do this. That is not what happened here. I am saying that I do not have enough evidence to go forward 30 years later, and I am saying it would be a waste of taxpayer dollars to go forward 30 years later." These statements were materially false and were made with knowledge of their falsity. At the time Flynn made them: ECDA's own Conviction Integrity Unit had collaborated for years with Lynch's post-conviction counsel and had access to the abundant exculpatory evidence, including the suppressed Walker alibi evidence that ECDA itself had acknowledged knowing prior to Ms. Lynch's trial at the 2018 hearing; ECDA had not opposed Lynch's motion to vacate; Justice Boller had vacated Lynch's conviction on the ground that material favorable to the defense had been withheld; and ECDA had itself moved to dismiss the indictment. Flynn's public insistence that he was not exonerating Lynch—framing the outcome as a mere failure of evidence rather than a wrongful conviction— was not merely misleading. It was the final act in a pattern of official conduct designed to deny Lynch the public vindication and legal recognition of innocence to which she was entitled, to prejudice Lynch's ability to pursue civil remedies, and to perpetuate the official narrative that had produced her wrongful conviction.

435. The foregoing conduct was a calculated course of official conduct by Flynn in his capacity as District Attorney. By stripping the (b) and (g) grounds from Lynch's vacatur motion,

Flynn eliminated the § 8-b predicate and suppressed any judicial acknowledgment of the full scope of the misconduct, and Lynch's innocence. By then issuing a press release that falsely characterized Walker's alibi as merely "uncorroborated" participation—rather than a pre-trial-known, affirmatively established out-of-state alibi—Flynn ratified in the public record the lie that had been suppressed since before Lynch's trial. And by publicly declaring that he was "not exonerating" Lynch while dismissing the indictment as a cost-benefit decision, Flynn prevented Lynch from achieving the recognized actual innocence status that would have supported both her § 8-b claim and her broader civil remedies. Each act reinforced the others, and all three were directed at the same goal: closing the courthouse door to Renay Lynch while maintaining the false narrative of guilt that the conspiracy had constructed.

436.    Flynn, as the elected District Attorney of Erie County, was at all relevant times the final policymaker for the County on matters of criminal prosecution and post-conviction practice. His decisions regarding the grounds on which ECDA would support or decline to oppose a motion to vacate, the terms he imposed on Lynch as a condition of that support, and the public statements he issued in connection with the vacatur and dismissal constituted official acts, policies, and/or customs of the County of Erie.

437.    Flynn acted knowingly, intentionally, willfully, and with deliberate indifference to Lynch's constitutional right of access to the courts. Specifically: Flynn's office had engaged in years of collaboration with Lynch's post-conviction counsel through the Conviction Integrity Unit and was fully aware of the exculpatory evidence, including the suppressed Walker alibi; ECDA had acknowledged at the 2018 hearing that it knew before Lynch's trial that Walker was out of state; Flynn personally engaged in negotiations through an intermediary and directed, through his own assistant district attorneys, that the (b) and (g) grounds — the grounds establishing

prosecutorial misconduct and suppressed evidence—be stripped from Lynch's motion, and characterized those grounds as "a bridge too far"; and Flynn made his public statements denying exoneration in full knowledge of the vacatur's basis and of the suppressed evidence his office had long possessed.

438.    Flynn knew, and could not have been unaware, that his conditions would materially diminish or preclude Lynch's ability to recover from any court for her wrongful imprisonment—no claim under § 8-b could survive without a judicial record establishing prosecutorial misconduct or newly discovered evidence of innocence, and Flynn had deliberately stripped both. Flynn's conduct was not inadvertent or negligent. It was calculated to foreclose Lynch's remedies while shielding ECDA from accountability.

439.    By reason of the foregoing, Flynn and Defendant County of Erie are liable to Renay Lynch pursuant to 42 U.S.C. § 1983. As a direct and proximate result of the denial of Lynch's right of access to the courts, Lynch suffered, and continues to suffer, severe and lasting injuries and damages, including but not limited to: the material impairment or permanent loss of her ability to maintain a claim under Court of Claims Act § 8-b for twenty-four years of wrongful imprisonment—a claim that was, by any measure, among the most meritorious such claims that could be brought under that statute; the absence of any official judicial recognition of her actual innocence; the perpetuation through Flynn's false press statements of a public record that continues to misrepresent her as a person who "may" have committed a murder for which she spent more than twenty-five years in prison; and all other compensatory damages flowing from the deprivation of a meaningful judicial remedy in an amount to be determined at trial.

440.    Lynch's backwards-looking First Amendment claim provides a remedy that is not otherwise available in a suit that could presently be brought: (a) monetary damages based on the

63

deprivation of her ability to be declared actually innocent under New York law, and for the loss and value of her Court of Claims Act § 8-b action, (b) a factual finding by a federal jury that Defendants deprived Lynch, and conspired to deprive Lynch, of her First Amendment right of access to the Court and to obtain a judicial declaration of probable actual innocence.

441. Defendant County of Erie and Town of Amherst are liable for this tort by virtue of their respective final policymaker's direct participation in a civil conspiracy to deprive Lynch of the aforementioned rights, and to coverup that conduct. *See, e.g.*, ¶¶ 453-466, below. Likewise, Askey, Melton, LaCorte, and Klimczak are individually liable for this tort by virtue of their participation in a civil conspiracy to deprive Lynch of the aforementioned rights, and to coverup that conduct.

**SEVENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Failure to Intervene**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

442. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

443. By their conduct and under color of state law, Defendants Askey, Melton, LaCorte, and Klimczak had opportunities to intervene on behalf of Renay Lynch to prevent her false arrest, malicious prosecution, false imprisonment, and her deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

444. These Defendants' failures to intercede violated Ms. Lynch's clearly established constitutional rights to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1995 through 1998 would have believed that failing to intervene to

prevent these Defendants from: fabricating inculpatory evidence; intentionally using unduly unreliable interrogation procedures and/or direct suggestion and/or coercion to obtain inculpatory statements; withholding material, exculpatory and/or impeachment evidence; deliberately failing to conduct a constitutionally adequate investigation; and causing Ms. Lynch to be arrested and prosecuted without probable cause; were lawful.

445.    Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in her favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

446.    As a direct and proximate result of these Defendants' actions, Ms. Lynch was wrongfully convicted and imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

**EIGHTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Coercion**
*Against Defendants LaCorte and Klimczak*

447.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

448.    Defendants LaCorte and Klimczak engaged in an 18-month campaign to coerce Ms. Lynch to falsely confess to knowledge about a crime for which she actually had no information.

449.    Defendants LaCorte and Klimczak intentionally isolated Ms. Lynch, who habitually used drugs and was uniquely vulnerable to their pressure. These defendants then engaged in, *inter alia*, a deliberate course of lies, deception, coercion, threats of dire consequences if she did not cooperate, and false assurances of leniency and beneficial assistance if she did cooperate.

65

450.    As a result of these Defendants' improper and coercive tactics, Ms. Lynch's will was overborne and defendants caused her to cede to a manufactured "confession" that falsely incriminated herself in violation of her clearly established Fifth and Sixth Amendment rights to be free from compelled self-incrimination and to be afforded access to counsel.

451.    Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in her favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

452.    As a direct and proximate result of the actions of Defendants LaCorte and Klimczak in coercing false and unreliable evidence to be used against her at trial, Ms. Lynch was wrongfully convicted and imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

**NINTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Civil Conspiracy**
*Against All Defendants*

453.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

454.    Beginning no later than the Amherst Police Department's investigation of the death of Louise Cicelsky, and continuing throughout the prosecution, conviction, wrongful imprisonment of Plaintiff Renay Lynch, post-conviction proceedings, and beyond the vacatur of her conviction, Defendants Chief John B. Askey, Captain Michael J. Melton, Lieutenant Joseph LaCorte, and Detective Raymond Klimczak (the "Individual Police Defendants"); Frank Sedita III—first as an Assistant District Attorney ("ADA") of Erie County and thereafter as the elected District Attorney of Erie County; John Flynn, as the elected District Attorney of Erie County at the time of Plaintiff's exoneration; and others — did knowingly, willfully, intentionally, and/or

with deliberate indifference explicitly and/or implicitly agree, among themselves and with others known and unknown, named and unnamed, to accomplish the following unlawful and unconstitutional objectives:

(a) to falsely arrest and cause the prosecution and wrongful conviction of Renay Lynch for the murder of Louise Cicelsky, notwithstanding their knowledge or reckless disregard of the fact that the evidence supporting such charges was fabricated, manufactured, false, coerced, or otherwise unreliable and insufficient to establish probable cause or guilt beyond a reasonable doubt;

(b) to fabricate, manufacture, and/or cause the fabrication or manufacture of inculpatory evidence against Lynch—including false and coerced witness statements and testimony—and to conceal the fabricated nature of such evidence from Lynch, her counsel, and the courts;

(c) to suppress, withhold, and conceal from Lynch, her counsel, and the courts all material exculpatory and impeachment evidence—including evidence tending to identify the actual perpetrator(s), evidence undermining the credibility of the prosecution's witnesses, and evidence contradicting the fabricated narrative presented to the jury—in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny;

(d) to cover up, conceal, and perpetuate the Individual Police Defendants' and Sedita's misconduct—both during and after the criminal proceedings and during and after Sedita's tenure as District Attorney—so as to wrongfully maintain Lynch's conviction and prolong her unlawful imprisonment;

67

(e) to condition any consent by the Erie County District Attorney's Office to the vacatur of Lynch's conviction upon her proceeding exclusively under CPL § 440.10(1)(h) thereby deliberately and strategically depriving Lynch of her right to pursue judicial actions vindicating her rights, including by maintaining a claim before the New York State Court of Claims under the Unjust Conviction and Imprisonment Act, Court of Claims Act § 8-b, which requires vacatur on grounds other than CPL § 440.10(1)(h); and

(f) to make and cause to be made materially false statements to the press and the public regarding Lynch's guilt, even following the vacatur of her conviction and the dismissal of the indictment, so as to continue the cover-up, deny Lynch vindication, and perpetuate reputational and other harm to her.

455. Defendants, by express agreement or tacit understanding, agreed among themselves to fabricate evidence, suppress exculpatory material, create a false narrative to support the malicious prosecution of Ms. Lynch, and to conceal evidence of their misconduct. This agreement is evidenced by the coordinated nature of the misconduct, including the use of the same coercive and suggestive interviewing techniques across multiple investigative steps, the consistent failure to document exculpatory information, the mutual suppression of misconduct during Lynch's trial and for decades afterwards.

456. In furtherance of the foregoing conspiracy, the defendants committed numerous overt acts, including but not limited to those fully described herein, and specifically including:

(a) The Individual Police Defendants fabricated, manufactured, and presented inculpatory evidence against Lynch—including false and coerced statements

and testimony—and introduced that false evidence into the criminal proceedings against her;

(b) The Individual Police Defendants suppressed, withheld, and concealed from Lynch, her counsel, and the prosecution material exculpatory evidence, including fingerprint evidence pointing to the actual perpetrator(s) of the murder of Louise Cicelsky and evidence contradicting and undermining the inculpatory evidence marshaled against Lynch at trial, including the false confession attributed to Lynch and the false statement of incentivized informant Raquel Hunter;

(c) The Individual Police Defendants manipulated, pressured, coerced, and improperly induced Raquel Hunter and Ms. Lynch herself to provide false and misleading statements implicating Lynch;

(d) Sedita, while serving as an ADA and acting in coordination with the Individual Police Defendants, made pre-trial administrative and investigative decisions to proceed with the prosecution of Lynch while aware of, and in deliberate disregard of, exculpatory evidence in the possession of his office and the Amherst Police Department — including evidence that Kareem Walker had been in Florida at the time of the murder of Louise Cicelsky — and took affirmative steps to ensure that such material would not be disclosed to Lynch or her counsel, the grand jury, the court or the petit jury, in furtherance of the conspiracy to wrongfully convict and imprison her;

(e) Sedita, in his capacity as District Attorney of Erie County, continued after taking office to withhold, suppress, and conceal material exculpatory evidence

69

from Lynch and her counsel, and took affirmative steps to prevent the disclosure of prior misconduct, thereby extending and compounding Lynch's wrongful imprisonment;

(f) Flynn, in his capacity as District Attorney of Erie County, refused to publicly acknowledge or disclose the misconduct of his office and its predecessors in connection with Lynch's wrongful conviction, and conditioned ECDA's consent to the vacatur of Lynch's conviction upon her proceeding exclusively under CPL § 440.10(1)(h), with knowledge that doing so would foreclose Lynch's ability to pursue judicial actions vindicating her rights, including through a claim before the New York State Court of Claims under Court of Claims Act § 8-b, and that it would allow the conspiracy's cover-up to persist without any official acknowledgment of innocence;

(g) Flynn made materially false statements to the press and public by portraying Lynch as actually guilty of the murder of Louise Cicelsky, and ECDA and Sedita of having acted properly at all times, notwithstanding his own and ECDA's knowledge of Sedita's misconduct, and notwithstanding the vacatur of her conviction and the dismissal of the indictment, continuing the conspiracy's objective of suppressing the truth and causing further reputational, emotional, and economic harm to Lynch; and

(h) Each of the co-conspirators, individually and in concert, failed to disclose the truth regarding Lynch's wrongful conviction and took affirmative steps to conceal their misconduct, allowing Lynch to remain wrongfully imprisoned for

70

over twenty-six years, until her conviction was vacated on December 11, 2023, and the indictment against her was dismissed on January 5, 2024.

457. By virtue of the foregoing, defendants conspired to deprive Renay Lynch of the following rights secured by the Constitution of the United States:

    (a) The right not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable evidence—including the statements and testimony of witnesses who were improperly influenced, coerced, or manipulated to provide such statements and testimony—in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing the "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

    (b) The right not to be deprived of liberty absent probable cause to believe she had committed a crime, in violation of the Fourth and Fourteenth Amendments to the United States Constitution;

    (c) The right to timely disclosure of all material evidence favorable to the defense, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

71

(d) The ongoing right, following conviction, to disclosure of Brady material suppressed during trial, *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007); and to not have her malicious prosecution continued; and

(e) The right of access to the courts and to a meaningful remedy for unconstitutional imprisonment.

458. Sedita and Flynn each joined and participated in this conspiracy in their respective capacities as the elected District Attorney of Erie County, and each served as the final policymaker for the County on all matters relating to criminal prosecution. As co-conspirators who joined an existing conspiracy, both Sedita and Flynn assumed full liability for all acts and all damages caused by the conspiracy from its inception and furthered by their actions, including acts committed by the Individual Police Defendants prior to their respective dates of joinder. Because each of Sedita's and Flynn's knowing, willful, and affirmative participation in the conspiracy occurred during, and by virtue of, their roles as the final policymaker for Erie County on matters of criminal prosecution, their conduct constitutes an official policy or custom of the County sufficient to impose *Monell* liability. *See* ¶¶ 480-574.

459. At all times relevant to this complaint, Defendant John B. Askey was the Police Chief of the APD. Askey held the highest supervisory and managerial position of the APD, and had the final, discretionary authority over all personnel, investigative, and detention decisions undertaken by the Police Department.

460. At all times relevant to this complaint, Defendant Michael J. Melton was the Captain of the APD. Melton was the Head of the Detective Bureau, delegated by Defendant Askey with overseeing detectives of the APD including Defendants LaCorte and Klimczak.

72

461.    Pursuant to New York Town Law § 150, the Town of Amherst, a duly authorized municipality of the State of New York, created the Town of Amherst Police Department. Pursuant to Amherst Town Code § 39-1, the Town delegated the power to grant police assistance solely to the Amherst Chief of Police, Defendant John B. Askey.

462.    Pursuant to the above, Town resolutions, and local customs, Defendant John Askey had final Town of Amherst municipal policymaking authority with respect to (a) the investigation of crimes occurring within the Town of Amherst, (b) the interrogation of suspects within the Town, (c) the referral to the Erie County District Attorney's Office of cases for criminal prosecution, (d) the gathering, forwarding, and presentation of evidence of alleged criminal conduct within Town limits to the Erie County District Attorney's Office, (e) the decision to arrest and charge individuals suspected of criminal conduct within Town limits, (f) post-arrest collaboration with the ECDA in connection with the prosecution of criminal actions the Amherst Police Department referred to the ECDA, and (g) the above acts and omissions attributed to Chief Askey in this complaint.

463.    Further, the Town, its Supervisor, and its government (a) failed to provide any provision or mechanism whereby Chief Askey's investigative decisions and powers identified above, could be reviewed or subject to oversight, (b) never participated in or challenged those investigative decisions and Chief Askey's exercise of powers identified above, and (c) never reviewed or overruled the Chief concerning those matters.

464.    Chief Askey, by virtue of the above formal acts, customs, and delegation, was the formal and/or de facto policymaking official for the Town of Amherst concerning the aforementioned areas. As such, Chief Askey's participation in the conspiracy against Lynch renders the Town of Amherst liable under *Monell*. *See supra* ¶¶ 455-609.

465. The defendants committed the foregoing violations of Renay Lynch's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to those rights and to the devastating effect that their concerted misconduct would have—and did have—upon Lynch. In particular, Flynn acted with knowledge that conditioning vacatur on CPL § 440.10(1)(h), and requiring Plaintiff to forgo her valid and factually supported claims under CPL §§ 440.10(1)(b) and (g) would, as a matter of law, foreclose Lynch's ability to seek judicial redress for the violation of her rights, including under the Unjust Conviction and Imprisonment Act, Court of Claims Act § 8-b, and with knowledge that his public statements regarding Lynch's guilt were materially false and would cause her further harm.

466. By reason of the foregoing, defendants are liable to Lynch pursuant to 42 U.S.C. § 1983. As a direct and proximate result of defendants' civil conspiracy, Lynch suffered, and continues to suffer, severe and lasting injuries and damages, including but not limited to: the loss of liberty for more than twenty-five years; physical and psychological harm sustained during her wrongful incarceration; severe emotional distress, mental anguish, and trauma; loss of wages and earning capacity; loss of familial relationships, companionship, and social connections; damage to her reputation, which was further compounded by Flynn's materially false public statements; and the loss of her right to pursue a remedy under the New York Unjust Conviction and Imprisonment Act (Court of Claims Act § 8-b), which was deliberately foreclosed by Flynn's conditioning of the vacatur on CPL § 440.10(1)(h) grounds. Ms. Lynch is entitled to compensatory damages in an amount to be determined at trial. In addition, because the defendants' conduct was willful, intentional, and undertaken in conscious disregard of Ms. Lynch's federally protected rights, Ms. Lynch is entitled to punitive damages against the individual defendants in an amount sufficient to punish and deter such conduct.

74

**TENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
**Supervisory Liability**
*Against Defendants Askey and Melton*

467. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

468. The individual defendant police officers, and/or detectives LaCorte and Klimczak, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendants Askey and Melton, and other supervisors, in this case and as a matter of practice.

469. Defendants Askey and Melton, and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers and detectives, and thereby caused the individual defendant police officers and detectives to deprive Ms. Lynch of her clearly established constitutional rights, including her rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and to a fair trial.

470. Had Defendants Askey and Melton and other supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers and detectives, those defendants would not and should not have used unduly unreliable interrogation procedures and/or direct suggestion and/or coercion to obtain fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Ms. Lynch to be arrested and prosecuted without probable cause. Defendants Askey and Melton and other supervisors were directly involved in the investigation of Ms. Lynch and directly supervised the specific investigative acts taken by the individual police officer and detective

defendants in this case.

471. The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Askey and Melton and other supervisors under color of state law violated their clearly established duty, in 1995 through 1998, to supervise Defendants LaCorte and Klimczak, and no reasonable police supervisor in 1995 through 1998 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

472. Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in her favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

473. As a direct and proximate result of Defendant Melton's actions and omissions, Ms. Lynch was wrongly convicted and imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

## ELEVENTH CAUSE OF ACTION
### *Monell* Claim for the Unconstitutional Custom or Policy
### of Failing to Adequately and Faithfully Account for and Preserve Forensic Evidence
### in the Town's Possession Under *Newton v. City of New York*[9]
### *Against Defendant Town of Amherst*

474. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

475. The Defendant Town of Amherst, by and through its final policymakers, maintained a custom, policy, or practice of withholding or destroying forensic crime scene evidence, such as fingerprints and DNA test results, sought for use by defendants at trial and by inmates for post-conviction remedies and testing.

---

[9] *Newton v. City of New York*, 779 F.3d 140 (2d Cir. 2015).

476.    The Defendant Town of Amherst, by and through its final policymakers, also maintained a custom, policy or practice of failing to train and supervise its employees who were custodians of forensic crime scene evidence on how to maintain such evidence, such as fingerprints and DNA test results, sought for use by defendants at trial and by inmates for post-conviction remedies and testing.

477.    These customs, policies or practices were the moving force behind the violation of Renay Lynch's First, Fifth, and Fourteenth Amendment rights, including but not limited to the rights to:

    (a)  a fair trial;

    (b)  not be deprived of liberty in the absence of due process of law; and

    (c)  unfettered access to the courts for the presentation of material evidence.

478.    As a direct and proximate result of Defendant Town of Amherst's deficient evidence management system and/or grossly negligent, reckless, or deliberately indifferent failure to adequately and faithfully account for, preserve, and/or turn over forensic crime scene evidence in the Town's possession to Ms. Lynch for use in her appeals, she was prevented from vindicating her liberty interest by demonstrating her innocence, in violation of her Fourteenth Amendment right to due process.

479.    As a direct and proximate result of the Defendant Town of Amherst's actions, Ms. Lynch spent additional years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

**TWELFTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
***Monell* Municipal Liability for the**
**Misconduct of Prosecutors**
*Against Defendant County of Erie*

480.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

481.    The Defendant County of Erie, through its District Attorney's Office (hereinafter, the "District Attorney" or the "DA") and his authorized delegates, at all relevant times, had final authority with respect to the training, supervision, discipline, and overall management of personnel employed by or assigned to the ECDA with respect to all of the office's functions, including the investigation and prosecution of criminal cases, and constituted Erie County policymakers for whose actions or omissions the County is liable.

482.    The District Attorney, at all relevant times, was and is an elected officer of the County, and the ECDA was and is substantially funded out of the County's budget.

483.    The District Attorney was and is designated a "local officer," rather than a "state officer," under New York Public Officers Law § 2.

484.    The DA and his assistant district attorneys are agents and employees of the Defendant Erie County.

485.    Under New York State law, the County, at all relevant times, was liable for torts committed by County officers and employees, including the District Attorney and his assistants. *See* N.Y. County Law § 53.

486.    The County represents such officers and employees in judicial proceedings and indemnifies them because they are County officials.

78

487.     At the time of Ms. Lynch's criminal trial, as a criminal defendant, she was entitled, under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, to timely disclosure of all material information that was in the actual or constructive possession, custody, or control of the ECDA that was favorable to the defense, including but not limited to exculpatory information that tended to contradict the prosecution's case or otherwise show Ms. Lynch was innocent, and impeachment information that tended to undercut the credibility of the witnesses against her, known as "*Brady* material."

488.     The prosecution was constitutionally required to disclose *Brady* material as soon as reasonably possible regardless of whether the defense had made a specific request for it.

489.     The prosecution was constitutionally required to find out about and disclose such information, whether it was in its actual possession or in the possession of any police department that had been involved in the investigation or prosecution of the matter, including the Town of Amherst Police Department.

490.     This was a continuing obligation even after a conviction at trial, such as during proceedings brought by a convicted defendant challenging her conviction.

491.     While the right to timely disclosure of *Brady* material was intended to guarantee the fairness of a criminal trial, the prosecution also had an obligation under the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution to disclose evidence favorable to the defense early in a criminal prosecution where it was so clearly relevant to whether the prosecution should continue or the defendant should be released on bail that the suppression of that evidence would shock the conscience.

492.      Similar to the *Brady* obligation is the state constitutional requirement, established by *People v. Rosario*, 9 N.Y.2d 286 (1961), requiring disclosure at trial of the prior recorded

statements of prosecution witnesses so that defense counsel, singularly dedicated to their client's cause, could decide how to use such material to impeach such witnesses.

493.    Often, *Rosario* material also contains information favorable to the defense as defined by Brady and its progeny.

494.    Related to *Brady* is a prosecutor's constitutional obligation, at all stages of a criminal prosecution, not to rely on or fail to correct false or misleading evidence or argument.

495.    The suppression of evidence favorable to the defense from the court during a preliminary hearing or bail hearing, or from a grand jury deciding whether to vote an indictment, and from a petit or trial jury, likely would leave an impermissibly false or misleading impression with the fact finder about the strength of the evidence supporting the prosecution's case and about the defendant's guilt.

496.    The federal constitutional obligation to make timely disclosure of evidence favorable to the defense for use during pretrial and trial proceedings superseded any provisions of the state's Criminal Procedure Law or the *Rosario* rule to the extent such state rule was less protective of a criminal defendant's rights.

497.    In other words, the federal constitutional requirement of prompt disclosure of evidence favorable to the defendant, irrespective of whether the defense had made a specific request, applied despite state discovery provisions to the contrary.

498.    Furthermore, a prosecutor had a constitutional obligation not to conduct herself/himself before a jury in a manner that would deprive a criminal defendant of his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

499.    At the time of Ms. Lynch's trial in 1998, there were well-established rules of behavior for prosecutors before a jury, particularly with respect to eliciting false testimony from

witnesses and making false or misleading factual assertions and arguments to the jury. These rules were intended to ensure a fair trial.

500.     If serious enough, the violation of such rules would deprive a criminal defendant of her federal constitutional rights.

501.     The well-established rules regarding prosecutorial conduct prohibited prosecutors from making false or misleading factual assertions or arguments, arguing "facts" or "evidence" that were not in the record, eliciting false testimony from witnesses, expressing the prosecutor's personal belief in the defendant's guilt or a witness's credibility, and failing to correct false testimony of witnesses.

502.     The prosecutors handling the prosecution of Ms. Lynch violated all these rules.

503.     As set forth above, the prosecutors of Ms. Lynch relied on false and misleading evidence and argument to cause a judge to find probable cause to continue the prosecution at the arraignment, denying bail and keeping Ms. Lynch in jail, causing the grand jury to indict Ms. Lynch, and to convict her at trial.

504.     The prosecution concealed from the view of the court, the grand jury, the trial jury, and, of course, from the defense, numerous pieces of favorable evidence that would have been fatal to the case against Ms. Lynch, including:

(a) Evidence that Kareem Walker was not in the State of New York at the time Louise Cicelsky was murdered and therefore was not involved in the Cicelsky murder.

   i. This critical, exculpatory information entirely contradicted the prosecution's felony murder case against Ms. Lynch, which rested on the

81

claim that Kareem Walker killed Ms. Cicelsky during a robbery jointly perpetrated by Mr. Walker and Ms. Lynch.

ii. That Mr. Walker was not involved in the murder of Ms. Cicelsky also demonstrates the falsity of Ms. Lynch's purported confession, the falsity of statements by other witnesses/informants, and the fact that witnesses against Ms. Lynch (including police officer witnesses such as Defendant LaCorte) were lying or not credible, and that police had coerced the false statements of Ms. Lynch and others.

(b) The existence of fourteen latent fingerprints from the crime scene and the testing of at least five of those prints in August 1995 – fifteen months before Ms. Lynch's arrest – which excluded Mr. Walker and found that four of the prints--found in very probative locations at the crime scene--belonged to Suspect C; plus testing that identified Suspect C, Ms. Cicelsky's downstairs tenant who had no connection to Ms. Lynch and had a violent criminal history that included convictions for domestic violence, robbery, and manslaughter, as the source of nine of the latent prints.

i. This information was critical and exculpatory. That fourteen latent prints were testable and at least five were tested in August 1995 demonstrates that Defendant Melton provided false trial testimony when he reported that only two prints recovered by police from Cicelsky's apartment were "usable."

ii. Only Stephen Kasper and Defendant Melton handled fingerprint analyses for APD and Kasper has stated under oath that "it was APD's policy and practice to create a request for every latent print analysis," that APD should

82

have created a request and report for all 16 suspects listed by the APD in a worksheet dated June 6, 1995, that 5 latent prints listed in this worksheet "would have been suitable for comparison," that fingerprints L-1, L-7 which were collected by APD "would have been suitable for comparison in May of 1995," and that the markings on these prints—which indicate the initiation of an analysis—were not made by him.

iii. Moreover, the fact that nine latent prints belonged to Suspect C was favorable evidence that supported Ms. Lynch's innocence defense and would have undermined the credibility of police prosecution witnesses, including Defendant Melton.

iv. Additionally, the exclusion of both Walker and Lynch as the sources of the prints in Ms. Cicelsky's home would have undermined the prosecution's felony murder case against Ms. Lynch, which rested on the claim that Kareem Walker killed Ms. Cicelsky during a robbery jointly perpetrated by Mr. Walker and Ms. Lynch, contradicted Ms. Lynch's false "confession" and the other witness/informant statements---including police witness testimony.

v. Finally, that no additional investigation was done into how Suspect C's prints came to be in the victim's apartment undermined the quality of the police investigation and would have provided a basis for vigorous cross-examination of police witnesses and Ms. Lynch's argument that she was a victim of incompetent police officers who did not legitimately investigate this crime but instead targeted her because she was a vulnerable person.

83

(c) That both Ms. Lynch and witnesses against her had been coerced by police into making false statements that implicated Ms. Lynch and Kareem Walker, and that all facts contained in those statements came either from the police (who knew them from their investigation) or from publicly available information.

505. Had all this favorable evidence been timely disclosed, either the case against Ms. Lynch would have been dismissed, or Ms. Lynch would have been released on bail early in the proceedings and ultimately would have achieved a more favorable outcome at her trial.

506. Further, as shown above, the trial prosecutor violated virtually all the rules of conduct for prosecutors, deprived Ms. Lynch of her constitutional right to a fair trial, and contributed to the jury's guilty verdict. In particular:

(a) The ECDA trial attorney repeatedly asserted false claims, including in his opening statement and summation. These false claims included that Kareem Walker killed Ms. Cicelsky on or about May 19, 1995, and that no fingerprints were left behind by Ms. Cicelsky's "skillful" and "careful" killers.

(b) The ECDA trial attorney repeatedly elicited false testimony from prosecution witnesses concerning Mr. Walker's participation in the crime, the absence of fingerprints at the crime scene, the purported lack of any coercion of Ms. Lynch, and emphasizing that all of the details in her confession came from her own personal knowledge, rather than from the detectives themselves.

(c) Finally, when cross-examining Ms. Lynch, the ECDA trial attorney repeatedly challenged her truthful testimony that neither she nor Kareem Walker were involved in the crime and, in the summation at trial, challenged her truthfulness and credibility based on these denials.

84

507.    Thereafter, prosecutors at the ECDA, reflecting their Office's ongoing indifference to their *Brady* obligations and other constitutional violations, successfully opposed Ms. Lynch's motions to overturn her conviction by misleading Ms. Lynch and the courts about whether specified items had been disclosed at trial and whether such items were favorable to the defense under *Brady* at all.

(a) This behavior prolonged for many years Ms. Lynch's imprisonment as well as imposing deep restrictions upon her liberty as a parolee.

(b) Individually and collectively, the above misconduct deprived Ms. Lynch of her constitutional rights to due process, to a fair trial, to be free from unreasonable seizure, and was a substantial cause of Ms. Lynch's constitutional injuries.

(c) This misconduct continued even as ECDA concluded its reinvestigation of Ms. Lynch's conviction and agreed to join in Ms. Lynch's motion to vacate her conviction, by, *inter alia*,

i.   Agreeing to join Ms. Lynch's motion to vacate her conviction only so long as Ms. Lynch forgo as a basis of her exoneration that ECDA had suppressed that Kareem Walker was out of state at the time of the crime;

ii.  Misleading the court about why Ms. Lynch's conviction should be vacated;

(d) This misconduct was compounded by District Attorney Michael Flynn's false press release and public statement concerning the reason why Walker was not prosecuted and Ms. Lynch's non-involvement in the crime.

508.    Individually and collectively, these violations of Ms. Lynch's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful policies, customs, or practices of the ECDA as well as by the deliberate indifference of policymakers at that

office, acting on behalf of the Defendant Erie County, to the occurrence of such constitutional violations.

509. Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his authorized delegates had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ECDA regarding their constitutional obligations.

510. Nevertheless, at the time of Ms. Lynch's trial, and during the pendency of her wrongful incarceration and parole, the ECDA maintained unlawful policies, customs, or practices, and was indifferent to violations of fair trial rights, all of which were a substantial cause of the violations of her constitutional rights and of her damages.

511. Specifically, first, the ECDA had an unlawful policy, custom, or practice of not disclosing *Brady* material to the defense, the court, or the grand jury at the bail hearing, and grand jury stages of a case, thereby deceiving fact finders about the strength of the prosecution's case and causing criminal defendants to be unfairly and unreasonably deprived of their liberty.

512. Second, the ECDA had an unlawful policy, custom, or practice of not disclosing evidence favorable to the defense, even exculpatory evidence, for use at trial, including when the defense specifically requested it.

513. Third, the ECDA had an unlawful policy, custom, or practice of turning a blind eye to patently false and fabricated evidence produced by law enforcement and neglecting to take reasonable steps to ensure that it had obtained all discoverable information, including information favorable to Ms. Lynch and/or exculpatory information, from law enforcement.

514. Fourth, the ECDA had a policy, custom, or practice for prosecutors, especially in high profile cases, to elicit false testimony or fail to correct false testimony from its witnesses, and

86

to make misleading and even false opening arguments and summations that violated the aforementioned well-established rules governing prosecutors and which, like *Brady* violations, deprived defendants in criminal cases, such as Ms. Lynch, of their constitutional right to a fair trial.

515. Indeed, prosecutors would give opening statements and summations that were false or misleading precisely because they contradicted evidence that the same prosecutors had suppressed under *Brady*.

516. Fifth, the ECDA had a policy, custom, or practice of continuing to withhold *Brady* material when faced with post-trial motions by a defendant challenging the lawfulness of her conviction, thereby prolonging the defendant's imprisonment.

517. Finally, Sixth, despite creating a conviction integrity unit (CIU) in or about 2018, the ECDA had a policy, custom, or practice of disregarding recommendations of its own assistant district attorneys reinvestigating cases; presenting misleading or false evidence to courts considering defendants' efforts to vacate their convictions; and continuing to suppress favorable evidence from defendants seeking vacatur of convictions.

518. The District Attorney and his designees, as policymakers for the ECDA and the County, encouraged such violations to occur through their policy of deliberate indifference to them.

519. At all relevant times, the ECDA had no prosecution manual or other written rules or procedures regarding *Brady* and *Rosario* disclosure or trial advocacy, including opening and summation behavior.

520. At all relevant times, the ECDA had no employee handbook, manual, or other document setting forth any disciplinary process for prosecutorial misconduct, or potential

87

sanctions for them, nor was any such process made known to employees in some other manner as a deterrent to such misconduct.

521.    At all relevant times, even though the District Attorney knew or should have known that prosecutors on his staff, including the most experienced prosecutors handling the ECDA's most important cases, were committing constitutional violations that deprived criminal defendants of their constitutional right to a fair trial, he did not supervise, or require supervision of, prosecutors in connection with such functions.

522.    He and his designees kept no record of misconduct by individual prosecutors.

523.    He neither investigated nor disciplined prosecutors who violated rules designed to protect the fair trial rights of criminal defendants.

524.    He did not train prosecutors in such functions, even when he became aware or should have been aware of appellate decisions that showed the ECDA's policies, customs or practices were unlawful.

525.    The knowledge among ECDA prosecutors that there would be no personal consequence for them if they violated the due process and fair trial rights of criminal defendants encouraged prosecutors, including the prosecutor handling Ms. Lynch's case, to believe that such violations would go unpunished.

526.    Likewise, ECDA prosecutors understood that they could face personal consequences for seeking to bring to light or for otherwise challenging violations of due process and fair trial rights of criminal defendants, which encouraged prosecutors, including those handling Ms. Lynch's post-conviction proceedings, to believe that they could face punishment for revealing past constitutional violations.

527. The District Attorney's policy, custom, and/or practice of approval, ratification of, or deliberate indifference to, violations by ECDA prosecutors of their constitutional obligations to afford criminal defendants a fair trial foreseeably encouraged such violations to continue.

528. Many years before Ms. Lynch's prosecution was initiated, in *Giglio v. United States*, 405 U.S. 150 (1972), the United States Supreme Court held that a prosecutor's office is responsible for disclosing impeachment evidence known to members of the office even if the trial prosecutor in the given case is not aware of such evidence.

529. The same rule applied to evidence known to police detectives who worked on the case.

530. In the same decision, the Court advised district attorneys to adopt office-wide information-management systems to keep track of impeachment evidence to make sure that the assigned prosecutor would learn about it and disclose it.

531. Nevertheless, the ECDA adopted no system of checklists, receipts, or other procedures to ensure that all investigative records of the APD would be made available to the assigned prosecutor so that he or she could fulfill their *Brady* obligations.

532. The absence of any such procedures created the predictable risk that, in a case like Ms. Lynch's, police records containing evidence favorable to the defense would not be obtained or disclosed by the ECDA.

533. As a result, Ms. Lynch's prosecutor did not disclose evidence favorable to the defense or, under the ECDA's overly restrictive view of the state *Rosario* obligation, had to be disclosed as a witness's formal, signed, prior-recorded statement.

534. Court decisions concerning matters that pre- and post-date Ms. Lynch's trial reveal the misunderstanding of ECDA prosecutors regarding their Brady and related Rosario obligations

89

and the ECDA's policy, custom, and practice to violate the requirements of Brady and Rosario as well as the requirements placed on prosecutors by applicable rules and constitutional provisions.

535. For example, in 1994, ECDA obtained convictions of two men, Brian Scott Lorenzo and James Pugh, for various felonies arising out of the 1993 murder of a woman in her Tonawanda, New York home. *See People v. Lorenzo*, 2023 N.Y. Slip Op. 51515 (N.Y. Sup. Ct. 2023).

536. Tonawanda police obtained inculpatory statements from both Lorenzo and Pugh, which each man subsequently recanted, as well as statements implicating the men from six individuals, including jailhouse informants, to whom the men purportedly made inculpatory statements. *Id*.

537. While no physical evidence connected Pugh to the crime, when Lorenzo was arrested on unrelated charges several months after the crime, a 1921 Morgan S Silver Dollar was recovered from a duffel bag seized from a stolen car driven by Defendant Lorenzo. *Id*.

538. ECDA called the victim's husband and young daughter to identify the 1921 Morgan S Silver Dollar as one that had been given to the victim and her family by her father-in-law, Cyril Meindl, and argued the importance of this physical connection between Lorenzo and the crime to the jury in opening and summation. *Id*.

539. For nearly thirty years, Lorenzo and Pugh asserted their innocence and brought various legal challenges to their convictions.

540. ECDA opposed each of these efforts and the men remained in prison.

541. Throughout the trial, direct appeal, and post-conviction proceedings, ECDA suppressed from the defense and the courts that Cyril Meindl had been shown the coin and "did not and could not identify" the 1921 Morgan S Silver Dollar found with Lorenzo as the one he gave to his daughter-in-law (the victim) and her family. *People v. Lorenzo*, 2023 N.Y. Slip Op.

90

51515, ¶ 7 (N.Y. Sup. Ct. 2023) (hereinafter, "Lorenzo I"). The suppression of this exculpatory evidence was determined to be a *Brady* violation requiring vacatur of the men's conviction in 2023, affirmed in 2024. *See id*.; *People v. Lorenzo*, 2024 N.Y. Slip Op. 4681 (4th Dep't 2024) (hereinafter, "Lorenzo II").

542.    Importantly, the Erie County Supreme Court highlighted how ECDA exacerbated the *Brady* violation by improperly exploiting its suppression of the exculpatory evidence:

> (a) A review of the trial transcript reveals the prosecutor referenced the Cyril Meindl gift to Donald and Deborah Meindl in his opening statement and elicited that information in his direct examination of Donald Meindl. He also referenced the Cyril Meindl gift in his summation multiple times. The defendants explored this area on cross-examination of Donald Meindl and argued that the People's failure to call Cyril Meindl as a witness to corroborate Donald Meindl's testimony was problematic and impugned his identification of the coin. The inescapable conclusion is that the People fell short in their *Brady* disclosure obligation requiring this Court to conduct an analysis to determine if this violation requires a new trial some 30 years after the crime was committed. *Id*. at ¶ 8.

543.    Thus, in another prosecution involving criminal defendants who claimed innocence, ECDA suppressed exculpatory evidence and then made false and misleading arguments to factfinders that were unchallenged and unchallengeable because of the very suppression of exculpatory evidence, thereby violating the constitutional rights of criminal defendants and ensuring the wrongful conviction of innocent defendants.

544. The Supreme Court also granted Lorenzo and Pugh's motions to vacate their convictions on the basis of newly discovered evidence, including, as relevant here, evidence that inculpatory statements were coerced by investigating officers from both witnesses and defendants. *See Lorenzo I* at ¶ 7. As here, ECDA prosecutors either turned a blind eye to or accepted, and did not disclose to the defense, the coercive interrogation techniques used by police officers to obtain inculpatory statements from defendants and witnesses alike.

545. In a separate 1994 murder prosecution, ECDA obtained another wrongful conviction, also caused in substantial part by ECDA's suppression of exculpatory evidence from the defendant and presentation of false evidence and argument to the court and jury. ECDA also interfered with the cold case re-investigation undertaken post-conviction, thereby prolonging the wrongful incarceration. *See Peters v. City of Buffalo*, 848 F.Supp.2d 378, 385-87 (W.D.N.Y. 2012) (denying motion to dismiss and finding, in part, that plaintiff had adequately pleaded acts of prosecutorial misconduct not entitled to absolute or qualified immunity at the pre-indictment and post-conviction stages, including: controlling the conduct of criminal investigations; ordering an incomplete screening polygraph; directing law enforcement not to test DNA samples; directing the taking of a statement from a non-credible witness; falsely informing a witness that certain evidence existed when in fact it did not; making misleading public statements prior to trial; permitting witnesses to access police files for purposes of influencing their testimony; impeding a cold case investigation; compelling a witness to reaffirm a prior statement; threating another witness; and threatening high ranking police officers to cease further investigation.)

546. *Peters* involved the murder of a 13-year-old-girl in her Buffalo, New York home. ECDA corrupted the police investigation to ensure the arrest of the victim's innocent mother, Lynn

92

Peters, rather than another suspect, Dennis Donahue, whom substantial evidence implicated as the true perpetrator. Post-conviction DNA testing ultimately established Donahue's guilt.

547.    At Peters' trial, ECDA suppressed exculpatory testimony that contradicted the false testimony of a key prosecution witness and exculpatory crime scene evidence (photographs) that undermined the prosecution's theory; presented misleading and false facts to the court and jury designed to falsely bolster the credibility of its uncredible witnesses and implicate Peters— something ECDA could do only because it had suppressed exculpatory evidence that would have contradicted these false and misleading arguments.

548.    In addition, although forensic evidence, including DNA, was collected from the crime scene, ECDA directed that it not be tested. ECDA further directed that a statement be taken from the aforementioned unreliable, incentivized informant; did not disclose benefits it agreed to provide the informant, suborned perjury about those benefits; and made misleading and false arguments about the non-existence of those benefits; all while ECDA ignored substantial disparities between the informant's claims and the objective facts of the case.

549.    Finally, ECDA obstructed the Buffalo Police Department (BPD)'s attempt to reinvestigate the case by, inter alia, contacting high ranking members of BPD and witnesses and intimidating and pressuring them to ensure that the wrongful conviction would not be properly reinvestigated.

550.    Peters was exonerated in 2007, after DNA testing on forensic evidence from the victim's bedroom included Donahue, and other forensic testing wholly undermined the prosecution's theory that the victim had been strangled to death.

551.    Nor was this the only wrongful conviction in a homicide case obtained by ECDA in the 1990s.

93

552.     In 1998, the same year that Ms. Lynch was wrongly convicted, ECDA obtained at least two other wrongful convictions.

553.     Josue Ortiz was wrongly convicted by guilty plea following a false confession given while he was suffering from severe mental illness. As in this case, Mr. Ortiz's false confession contained facts known only to the real perpetrator and the police; did not contain any new or independently verifiable information; and contained a number of claims that were contradicted by the objective evidence. ECDA either turned a blind eye to, or accepted, the numerous failures in the police investigation and the prosecution's case and compounded those by not disclosing exculpatory evidence that would have allowed Mr. Ortiz to mount a defense to the charges. As in Ms. Lynch's case, ECDA suppressed from Mr. Ortiz significant, exculpatory evidence, including: forensic reports showing Ortiz's clothing did not have any trace evidence linking him to the crime; reports of crime lab analysis of footprints from the crime scene that supported the conclusion that Ortiz was not present; and statements of witnesses, including jailhouse informants, that exculpated Ortiz.

554.     In a second 1998 wrongful conviction case, Cory Epps was convicted of a murder he did not commit, based on an eyewitness's misidentification. *See, generally*, *Epps v. City of Buffalo et al.*, 19-cv-00281 (LJV)(LGF), Dkt. No. 1 (Complaint).

555.     Suppressed from Mr. Epps at trial and during his appeal were exculpatory statements made to the Buffalo Police Department by a woman, Wymiko Anderson, alleging that a different man, Russell Montgomery, had committed the crime, and that Montgomery killed Anderson's boyfriend to ensure his silence. *See id*. ¶ 43. Anderson told police that Montgomery looked like both the composite sketch created by an eyewitness, and like Epps. *Id*. ¶ 66.

94

Montgomery lived near the crime scene and bore a greater resemblance to the description of the perpetrator than Epps. *Id*. ¶ 44, 73, 83. Finally, Epps had an alibi. *Id*. ¶ 56.

556.    Despite the foregoing, BPD did not memorialize Anderson's exculpatory information. *Id*. ¶ 66, 76, 80. After Epps was convicted, Anderson sent Epps' attorneys an anonymous letter identifying Montgomery as the true perpetrator. *Id*. ¶ 77. Epps' attorneys brought a CPL § 330 motion based on the anonymous letter. *Id*. ¶ 78. The trial prosecutor sent the anonymous letter to BPD for it to investigate but took no follow up action. *Id*. ¶ 80. Epps' attorneys tried, and failed, to identify the source of the anonymous letter. *Id*. ¶ 81.

557.    The source of the anonymous letter was not identified by ECDA or BPD, and Epps was sentenced to 25 years to life. *Id*. ¶ 84. In 2001, Epps learned Anderson's identity, and filed a CPL § 440.10 motion, which ECDA opposed. *Id*. ¶88-98. Epps' motion was denied and he spent another sixteen years in prison. *Id*.. Finally, Epps was exonerated in 2017 when a witness came forward with information corroborating Anderson's claim that Montgomery had admitted to Anderson's boyfriend that he had committed the murder for which Epps was convicted. *Id*. ¶ 99-106.

558.    In addition to these cases, courts have found that, before, during and after Ms. Lynch's trial, ECDA routinely failed to disclose favorable and exculpatory evidence to defendants in criminal cases in violation of their constitutional rights.

559.    In a 1999 murder trial, ECDA failed to disclose to the defense a key eyewitness's initial statement to police that she "hadn't seen anything," a statement that directly contradicted her later statement, including testimony, describing the crime. *Barney v. Conway*, 730 F. Supp. 2d 264, at 276 (W.D.N.Y. 2010). The exculpatory statement first emerged during the witness's trial testimony and was objected to as a *Brady* violation; the trial court remedied the violation by

allowing the defense additional time to prepare to cross-examine the witness. On direct appeal, the Appellate Division, Fourth Department found that reversal was not required because of the additional time given to the defense. *People v. Barney*, 295 A.D.2d 1001 (4th Dep't 2002). The federal habeas court found the lower court's holding neither contrary to, nor an unreasonable application of, clearly established Federal law, but opined "[i]n this Court's opinion, the fact that [the witness] had initially denied knowing anything about the crime certainly is important impeachment evidence regarding a key prosecution witness." *Barney*, 730 F. Supp. 2d at 277.

560.    Similarly, in a December 2000 robbery trial, ECDA failed to turn over grand jury testimony of a testifying prosecution witnesses, causing the trial court to "chastise" the prosecutor, calling his "failure to disclose the material prior to trial . . . a 'huge mistake.'" *Goston v. Rivera*, 462 F.Supp.2d 383, 394 (W.D.N.Y. 2006). *See also People v. Goston*, 9 A.D.3d 905 (N.Y. App. Div. 2004). Once again, the trial court remedied the violation by providing the defense an additional opportunity to examine the witnesses thereby finding reversal was not required.

561.    In or about 2012, the trial court declared a mistrial because ECDA had committed a *Brady* violation by failing to disclose recorded telephone calls, and then destroying them. *People v. Maldonado*, 2014 N.Y. Slip Op. 8158 (4th Dep't 2014). At a subsequent trial, ECDA was precluded from using any recordings still in its possession, as a sanction for this Brady violation. *Id*.

562.    In addition to the foregoing, ECDA was the subject of numerous judicial decisions, dating back to the 1960s, condemning its practices relating to violations of criminal defendants' constitutional rights, including inter alia, making improper, misleading, or false arguments to the jury and failing to properly discharge their constitutional and statutory duties to provide criminal

defendants with all of the materials to which they are both constitutionally and statutorily entitled, including:

(a) *People v. Anderson*, 25 A.D.2d 602 (4th Dept. 1966), the Appellate Division unanimously reversed a defendant's felony assault conviction because of the prosecution's failure to disclose the testimony of the complainant and a second witness before a separate grand jury investigating a second defendant's involvement in the same incident.

(b) *People v. Kampshoff*, 53 A.D.2d 325, 332 (4th Dept. 1976), the Appellate Division did not reverse, but it noted that the prosecution had failed to disclose a key witness's statements recorded in police reports.

(c) *People v. Mitchell*, 99 Misc.2d 332 (Sup. Ct., Erie Co. 1979), a Supreme Court justice had to order the ECDA to disclose grand jury testimony where there was "no question" that it was "exculpatory." The court warned that "compliance with Brady cannot be made with clue-dangling or gamesmanship in place of full disclosure." *Id.* (quoting *People v. Bottom*, 76 Misc.2d 525, 529 (Sup. Ct., N.Y. 1974)).

(d) *People v. Cadby*, 75 A.D.2d 713 (4th Dept. 1980), the Appellate Division held that the prosecution had impermissibly withheld the prior statement of a key witness, the complainant, recorded in a police report, evidently because it was not a signed statement. The prosecution waited to disclose the statement until the defense elicited its existence from the prosecution's last witness, the police officer who had recorded it—too late to use it to cross-examine the declarant.

97

The Appellate Division remanded the case for a hearing into how prejudicial the error was to the defendant's right to a fair trial.

(e) *Matter of Potenza v. Kane*, 79 A.D.2d 467 (4th Dept. 1981), a mistrial had to be declared because of the trial prosecutor's apparent negligence in failing to disclose a tape recording of the defendant.

(f) *People v. Clark*, 89 A.D.2d 820 (4th Dept. 1982), the Appellate Division did not reverse due to lack of sufficient prejudice, but it noted that the prosecution did not disclose exculpatory material until near the close of the People's direct case.

563. On information and belief, not one of the prosecutors involved in any of the aforementioned cases was ever disciplined for these constitutional violations.

564. Indeed, despite this long history of exonerations of individuals wrongly convicted of crimes who were convicted because of ECDA's violations of their constitutional rights and the numerous judicial decisions disapproving of ECDA's conduct in criminal trials, ECDA's unconstitutional policies, customs, or practices, and/or ECDA's indifference to defendants' constitutional rights in criminal cases continues unabated to this day.

565. In 2023, Buffalo City Court Judge Rebecca L. Town issued a scathing opinion condemning ECDA's handling of its discovery obligations as well as its defense of same, finding that ECDA's own sworn attempt to justify its conduct "gives strong weight to the unmistakable conclusion that the People here are not taking their discovery obligations seriously and acting with due diligence." *People v. Nesbitt*, 81 Misc. 3d 907, 914 (Buffalo City Ct. Oct. 20, 2023).

566.    While Nesbitt involved the application of New York Criminal Procedure Law § 245.20 as amended in 2020, it demonstrates ECDA's ongoing failure to abide by, or even understand, its constitutional discovery obligations.

567.    In *Nesbitt*, after the defense specifically requested all body worn camera (BWC) footage relevant to the case, ECDA made a single request to the Buffalo Police Department (BPD) for the same. ECDA took no further action to obtain or produce the BWC and did not timely produce two separate BWC files to the defense.

568.    Despite this failure, ECDA filed a statutorily required certificate of compliance, pursuant to which ECDA certified in good faith that "after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery, the prosecutor has disclosed and made available all known material and information subject to discovery." N.Y. C.P.L. 245.20 and 245.50(1). The defense moved to dismiss the accusatory instrument, claiming that the certificate was invalid. Despite the undisputed existence of undisclosed BWC footage, ECDA opposed the defense's motion and affirmed that it had "done their due diligence, complied with our continuing discovery obligations, and filed our certificate of compliance and declared ready in good faith." *Id*. at 908.

569.    Particularly "troubling" to the court was ECDA's assertion that the "People cannot turn over what we do not possess," referencing BWC footage in the BPD's possession. This is a clear misstatement of the law, clearly established in *Giglio*, supra and later codified in CPL § 245.20(2), that materials held by the police are imputed to the prosecution.

570.    Finally, the Court rejected ECDA's claim that it had exercised the statutorily required due diligence by making a single request for the materials from the police near the end of the statutory discovery period.

571. *Nesbitt* makes clear that ECDA's unconstitutional policies and practices with respect to discovery persist to the present day, notwithstanding the numerous exonerations of innocent people, like Ms. Lynch, convicted by ECDA over the past three decades, and the numerous judicial decisions finding misconduct by its prosecutors.

572. That the policy of the ECDA at the time of Ms. Lynch's trial was to achieve convictions at any cost and to tolerate, if not encourage, misconduct is shown by these cases, as well as by various circumstances that include, but are not limited to:

(a) the promotion of prosecutors to executive positions, and to handle the most significant of the office's trials, who had a reputation for and a history of such misconduct;

(b) the failure to adopt or utilize any manuals, rules, procedures, or training to prohibit or prevent such misconduct;

(c) the failure to take any disciplinary action when prosecutors committed misconduct or were found by courts to have done so, and

(d) the DA's actions, including in responding to Ms. Lynch's direct appeal and post-conviction efforts to vacate her conviction, continuing to hide and/or defending prosecutorial misconduct in Ms. Lynch's case and similar misconduct by prosecutors in other cases.

573. The ECDA trial prosecutor in Ms. Lynch's case, Frank Sedita III, faced no discipline for obtaining Ms. Lynch's prosecution—despite his numerous violations of Ms. Lynch's constitutional rights. Indeed, after Ms. Lynch's conviction, Sedita was promoted within the ECDA. Sedita eventually ran for District Attorney, received important endorsements from key members of ECDA, and was elected to replace District Attorney Clark in 2008, a position he held until 2016.

During that time, ECDA protected Ms. Lynch's wrongful conviction and, as detailed supra, continued to suppress exculpatory evidence and make misrepresentations of fact to courts considering Ms. Lynch's efforts to vacate her conviction.

574.    ECDA's policy of deliberate indifference created an anything-goes or winning-is-everything mentality that was a substantial cause of the constitutional violations in Ms. Lynch's case and her resultant injuries.

**THIRTEENTH CAUSE OF ACTION**
**42 U.S.C. § 1983**
*Monell* **Municipal Liability for the**
**Misconduct of Employees of the APD**
*Against the Town of Amherst*

575.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

576.    At all relevant times, the Police Chief, Defendant John B. Askey; the captain of the detective bureau, Defendant Melton; detectives and other police officers employed by the APD were agents and employees of the Defendant Town.

577.    Under the principles of municipal liability for federal civil rights violations, the APD Police Chief, Defendant John B. Askey, or his authorized delegates, including Defendant Captain Melton, during all times relevant to this Complaint, had final responsibility for training, instructing, supervising, and disciplining police officers and other employees of the APD with respect to the investigation and prosecution of criminal matters, including homicides.

578.    The areas in which the Police Chief, Defendant John B. Askey, or his authorized delegates, including Defendant Captain Melton, were responsible for training, instructing, supervising, and disciplining police officers and other employees of the APD included but were not limited to:

(a) the constitutional obligation, pursuant to the Fourth, Fifth, and Fourteenth Amendments to the Constitution, not to initiate or continue a prosecution, and to cause a defendant's deprivation of liberty in a criminal case, without probable cause to believe he or she has committed a crime;

(b) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, not to fabricate or manufacture evidence, including the coercion of confessions and witness statements through illegal detentions without probable cause, threats, lies, or trickery and the preparation of false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

(c) the constitutional obligation, pursuant to the Fourth, Fifth, Sixth, and Fourteenth Amendments, to make timely disclosure of evidence favorable to the defense to the prosecution for timely disclosure in turn to a criminal defendant for use during pretrial and trial proceedings at which the defendant's liberty is at stake.

579. During all times material to this Complaint, the Town of Amherst, through its policymaking officials in the APD, owed a duty to the public at large and to Ms. Lynch to implement policies, procedures, training, discipline, customs, regulations, and practices sufficient to prevent, deter, and avoid conduct by APD employees that would result in the violation of the above-mentioned constitutional obligations.

580. During all times material to this Complaint, these policymakers, including Defendants Askey and Captain Melton, to whom policymaking responsibilities for homicide

investigations had been delegated, knowingly and intentionally breached, or were deliberately indifferent to, this duty.

581.    Furthermore, these policymakers created substantial incentives for their employees to commit the above-described constitutional violations by pressuring police officers, particularly homicide detectives handling high-profile investigations, to close cases and initiate prosecutions through coercion, trickery, falsification of reports, and suppression of evidence.

582.    The aforesaid deliberate or de facto policies, procedures, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees) were implemented or tolerated by policymaking officials for the Defendant Town—including but not limited to the Defendant Chief Askey, Defendant Captain Melton, Defendant Detectives, and the Amherst Police Department Club, Inc,—who knew, or should have known:

(a) to a moral certainty that such policies, procedures, practices, and/or customs concern issues that regularly arise during criminal investigations and prosecutions;

(b) that such issues present APD employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult;

(c) that APD employees facing such issues have significant incentives to make the wrong choices, especially given the pressure placed on APD employees to make arrests, close cases, and secure indictments and convictions;

(d) that the wrong choice by APD employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused person and cause him or her constitutional injury; and

(e) that APD employees had a history of making wrong choices in such

matters.

583.    At the time of Ms. Lynch's arrest and prosecution, APD policymaking officials were on notice of the risk of misconduct by APD employees that would violate the constitutional obligations identified in ¶ 536.

584.    Town of Amherst policymaking officials were on notice based in part on numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions discussing the constitutional obligations of police officers during criminal investigations and prosecutions.

585.    Town policymaking officials were also on notice based on the inherent obviousness of the need to train, supervise, and discipline police officers with respect to their constitutional obligations to counteract the pressure on such officers to close cases and to obtain arrests and convictions.

586.    Indeed, APD policymakers knew, well before the Cicelsky investigation, that its unconstitutional policy, practice, or custom of improperly coercive interrogation tactics to obtain coerced, unreliable, or fabricated evidence in criminal investigations violated the constitutional rights of criminal defendants.

587.    Indeed, two decades before Ms. Lynch's trial, the chief judge of the United States District Court for the Western District of New York condemned the very interrogation tactics used in this case. In *Robinson v. Smith*, 451 F. Supp. 1278 (W.D.N.Y. 1978) (Curtin, C.J.) the court condemned the same interrogation tactics used in this case: an illegal arrest, failure to *Mirandize*, threats, promises of benefits, use of incentivized informants, fraud and deceit, and an extended duration of interrogation. *Id.* at 1285-1292.

104

(a) Specifically condemning the use of fraud and deceit, Chief Judge Curtin wrote, "This police practice is to be soundly condemned. Such deception clearly has no place in our system of justice." *Id.* at 1291.

(b) The investigating officers came from the Buffalo Police Department, the largest police department in the region and a department with whom APD routinely collaborates.

588.    APD policymakers also knew at the time of the Cicelsky investigation that its unconstitutional policy, practice, or custom of improperly using incentivized, jailhouse informants to obtain coerced, unreliable, or fabricated evidence in criminal investigations; failing to maintain systems to track, vet, and disclose the use of jailhouse informants; failing to disclose benefits conferred upon jailhouse informants; failing to disclose jailhouse informants' history of cooperation in violation of *Brady v. Maryland* and its progeny; and failing to evaluate the credibility of jailhouse informants violated the constitutional rights of defendants in criminal cases.

589.    Indeed, APD encouraged or tolerated these practices by failing to supervise, train, and discipline officers who engaged in unconstitutional practices related to jailhouse informants.

590.    At the same time APD was pursuing Ms. Lynch in connection with the Cicelsky murder, APD enlisted the very same incentivized jailhouse informant, Raquel Hunter, to provide substantially similar testimony against another defendant, Dorothy Jones. Ms. Jones was tried during the same week of February 1998 as Ms. Lynch and, like Ms. Lynch, was convicted despite her claims of innocence. Ms. Hunter's cooperation in the Jones case was not disclosed to Ms. Lynch by the prosecution prior to trial, nor was Ms. Hunter's history of cooperation with APD or any other law enforcement agency.

105

591.    These cases and numerous other cases prior to and during the pendency of the Cicelsky murder case placed APD policymakers on notice about the coercive and otherwise improper investigation and interrogation tactics employed by APD in Ms. Lynch's case, which resulted in her wrongful conviction.

592.    Finally, demonstrating APD's deliberate indifference to these constitutional violations, the very same misconduct that caused Ms. Lynch's wrongful conviction continued for years after Ms. Lynch's conviction.

593.    In 2004, APD and the Buffalo Police Department jointly investigated a supposed robbery. This joint investigation resulted in the conviction of Keyontay Ricks, an African-American resident of Amherst, New York, who had committed no crime. Indeed, as it was later determined, no robbery had occurred at all.

594.    Mr. Ricks's conviction was vacated in January 2017 based on newly discovered evidence demonstrating that no robbery had, in fact, occurred. *Ricks v. Brown,* No. 20-CV-00043-LJV-HBS, 2020 U.S. Dist. LEXIS 172627, at *3 (W.D.N.Y. Sep. 21, 2020). Mr. Ricks filed several lawsuits alleging violations of his civil rights by members of both the APD and the Buffalo PD. In particular, Mr. Ricks alleged that a member of APD suppressed favorable information, fabricated inculpatory evidence, and pursued a criminal case against him as a result of his racial animus against African Americans.

595.    Despite this notice, at the time of the Cicelsky murder in May 1995, and through Ms. Lynch's trial in February 1998, APD policymaking officials failed to adequately instruct, train, discipline, and supervise police officers with respect to their obligations (1) to disclose to the defense or to prosecutors, evidence impeaching the credibility of prosecution witnesses or tending to exculpate criminal suspects or defendants; (2) to make a record of coercion or inducement of witnesses and of witnesses' prior inconsistent statements; (3) to preserve rather than destroy their

106

handwritten notes; (4) to refrain from fabricating evidence, including by using coercion or deception to obtain false confessions and witness statements and preparing false, materially misleading, or incomplete reports; and (5) to refrain from initiating or continuing a prosecution without probable cause.

596.    The issues of whether to preserve and to disclose evidence favorable to the defense to prosecutors or to the defense, how to ensure that evidence is not fabricated through false confessions and witness statements and false, misleading, or incomplete reports, and how to ensure that a prosecution is not initiated or continued without probable cause regularly arise in criminal investigations and prosecutions.

597.    Nevertheless, the APD provided no or plainly inadequate *Brady*-related training; provided no or plainly inadequate training concerning making and preserving a record of information that was favorable to a criminal suspect or defendant; had no policies at all, or at least no policies that were adequately made known to detectives, requiring disclosure of *Brady* material; and did not discipline officers who failed their constitutional duty to disclose such information to prosecutors.

598.    Similarly, the APD:

    (a)  provided no or plainly inadequate training on interview and interrogation protocols to ensure the truthfulness of confessions and witness statements;

    (b) affirmatively encouraged officers to illegally detain witnesses and suspects for interrogation and use or to close their eyes to coercive interview and interrogation tactics likely to lead to false confessions and witness statements;

    (c) provided no or plainly inadequate training on preparing reports that are truthful, accurate, and complete;

(d) had no policies at all, or at least no policies that were adequately made known to detectives, discouraging officers from using coercive interview and interrogation tactics, including the unlawful detention of witnesses and suspects, without probable cause, likely to lead to false confessions and witness statements;

(e) encouraged or at least tolerated detectives' practice to refrain from making a record of information favorable to suspects and defendants and to destroy their notes, and did not discipline officers who fabricated evidence by coercing false confessions and witness statements and preparing false, materially misleading, or incomplete reports.

599. Indeed, rather than provide formal training on lawful interrogation techniques, the APD endorsed on-the-job training by detectives who had a history and practice of unlawfully coercing witnesses, thereby perpetuating such practices and creating an atmosphere in which detectives assumed either that such techniques were appropriate or that, even if inappropriate or unlawful, they would get away with them without personal consequence to them.

600. The APD also provided no or plainly inadequate training on how to ensure that probable cause exists to initiate or continue a prosecution, including ensuring that the prosecution is not initiated or continued based on the use of manufactured or otherwise unreliable evidence.

601. APD policymaking officials had, before Ms. Lynch's arrest, issued no General Order provision or other written directive to officers concerning when, if at all, to disclose information favorable to a criminal suspect or defendant to prosecutors.

602.    With deliberate indifference to such misconduct, APD policymaking officials failed to take adequate steps to train, supervise, or discipline APD employees to prevent or deter such constitutional violations from occurring.

603.    As a result of the foregoing, at the time of the investigation of the Cicelsky murder, it was the policy, custom or practice of APD detectives to coerce false statements from suspects and witnesses, through unlawful investigatory detentions without probable cause and other means, to prepare false or misleading investigative reports, to fail to document information that was favorable to suspects and defendants or to destroy their notes containing such information, and to withhold evidence and information favorable to a criminal suspect or defendant from prosecutors.

604.    Additionally, detectives were encouraged to engage in such illegal activities by their knowledge that it would be at the very least tolerated and excused by APD policymakers, including Defendant Askey, for whom closing high-profile cases with arrests was the priority.

605.    This is apparent from the knowing participation in such illegal activities, during the Cicelsky investigation by Defendant Melton, the Captain of the Detective Bureau, and the policymaking official for the department with respect to homicide investigations.

606.    Indeed, Defendant Askey ratified the conduct of the APD officers he led, while Defendant Melton ratified the conduct of the unit he led, and made it into municipal policy by approving the arrest of Ms. Lynch, falsifying records, terminating a fingerprint analysis because it implicated Suspect C, and swearing to false facts that initiated the prosecution.

607.    That the Detective Bureau and many of its officers knowingly participated in fabricating a case against Ms. Lynch, documenting their fabricated case through a series of false or misleading investigative reports, omitting information favorable to Ms. Lynch from their

109

reports, destroying their notes, and withholding information favorable to a criminal suspect or defendant from the prosecutors, proves the existence of an anything-goes culture of illegality that policymakers' indifference to such misconduct predictably had wrought and that such misconduct was, at that time, the policy, custom and practice of the APD.

608.     The aforementioned unconstitutional or deliberately indifferent policies, procedures, training, discipline, customs, regulations, and/or practices of the APD were a direct, foreseeable, proximate, and/or substantial cause of the violations of Ms. Lynch's federal constitutional rights in this case by employees of the APD and her resulting injuries.

609.     By virtue of the foregoing, the Defendant Town is liable for the violation of Ms. Lynch's constitutional rights pursuant to 42 U.S.C. § 1983 and her resultant injuries.

## STATE LAW CLAIMS

### FOURTEENTH CAUSE OF ACTION
### Malicious Prosecution
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

610.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

611.     Defendants Askey, Melton, LaCorte, and Klimczak, despite knowing that probable cause did not exist to arrest and prosecute Renay Lynch for the robbery and murder of Louise Cicelsky, intentionally, recklessly, and with malice caused Ms. Lynch to be arrested and prosecuted for the robbery and murder of Louise Cicelsky, and to be convicted of those crimes. (*See* ¶¶ 173, 203-205, 245, 255, 284-87, 288, 318, 338-45 *supra*). Furthermore, these Defendants intentionally withheld from and misrepresented to Ms. Lynch's defense counsel, the grand juries, the courts, and Ms. Lynch's trial jury facts that further vitiated probable cause against her. (*See id. supra*).

612.     Ms. Lynch is completely innocent of the robbery and murder of Louise Cicelsky.

110

The prosecution finally terminated in Ms. Lynch's favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024. She was subsequently released from custody.

613.    As a direct and proximate result of these Defendants' actions, Ms. Lynch was wrongly convicted and imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

### FIFTEENTH CAUSE OF ACTION
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

614.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

615.    The improper, deliberate, and traumatizing conduct of the Defendants Askey, Melton, LaCorte, and Klimczak in deliberately and knowingly causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

616.    In the alternative, Defendants Askey, Melton, LaCorte, and Klimczak negligently and grossly negligently, and in breach of their duties owed to Ms. Lynch to, *inter alia*, refrain from relying on statements from witnesses that these Defendants knew or should have known were false; refrain from fabricating evidence; refrain from using suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements; refrain from failing to disclose material exculpatory and/or impeachment evidence; and otherwise act to deny Renay Lynch due process of law, directly and proximately caused Renay Lynch to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for twenty-five

years. Defendants' actions unreasonably endangered Ms. Lynch's physical and mental health and safety, and caused her to suffer physical and emotional harm, including physical ailments resulting from the circumstances and duration of her wrongful incarceration.

617.   These Defendants engaged in these acts within the scope of their employment.

618.   These claims are tolled as these Defendants concealed from Renay Lynch—and still are concealing to this day—their wrongful conduct giving rise to this cause of action.

## SIXTEENTH CAUSE OF ACTION
### State Law Negligence
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

619.   Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

620.   Defendants are liable for negligence, having breached their duty of reasonable care to Renay Lynch. Specifically, and by way of example, these Defendants:

   a.   failed to accurately and timely report how Ms. Lynch's became a suspect in the crimes and how these Defendants obtained Ms. Lynch's "confession" statements;

   b.   failed to accurately and timely report the results of fingerprint analyses that would have cleared Ms. Lynch and Kareem Walker and that would have placed Suspect C in probative locations within Ms. Cicelsky's apartment;

   c.   failed to properly preserve or maintain evidence;

   d.   failed to disclose fingerprints implicating Suspect C, the downstairs tenant, and exonerating Ms. Lynch;

   e.   failed to properly investigate leads in the investigation which suggested that others, including Suspect C, were responsible for Louise Cicelsky's murder and

112

that Ms. Lynch was not involved.

621. These Defendants also negligently failed to have, or adhere to, adequate policies and procedures for maintaining their investigatory actions as well as preserving and tracking physical evidence in their possession. These negligent acts also led to the "misplacement" of critical evidence such as the latent fingerprints from the scene which contained additional exculpatory evidence.

622. These Defendants' negligence and gross negligence directly and proximately caused Renay Lynch to be wrongfully prosecuted and imprisoned for twenty-five years and/or extended the length of time she was wrongfully imprisoned.

623. These Defendants engaged in these acts within the scope of their employment.

624. Renay Lynch is completely innocent of the robbery and murder of Louis Cicelsky. Renay Lynch's cause of action for negligence was unavailable to her until the prosecution finally terminated in her favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024. These claims are tolled as these Defendants concealed from Renay Lynch—and still are concealing to this day—their conduct giving rise to this cause of action.

### SEVENTEENTH CAUSE OF ACTION
**Article I, §§ 5, 6, and 12 of the New York State Constitution**
*Against Defendants Askey, Melton, LaCorte, and Klimczak*

625. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

626. The conduct of Defendant Askey, Melton, LaCorte, and Klimczak, described above, also violated Ms. Lynch's rights under the New York State Constitution, Article I, §§ 5, 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

627. Renay Lynch is completely innocent of the robbery and murder of Louise Cicelsky. The prosecution finally terminated in Ms. Lynch's favor after the conviction was vacated on December 11, 2023, and the indictment was dismissed on January 5, 2024.

628. As a direct and proximate result of these Defendants' actions, Ms. Lynch was wrongly imprisoned for twenty-five years and suffered the other grievous and continuing damages and injuries set forth above.

## EIGHTEENTH CAUSE OF ACTION
### *Respondeat Superior*
*Against Defendants Town of Amherst and County of Erie*

629. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

630. At all times relevant to this Complaint, Defendant Detectives and the Amherst Police Department Club, Inc, (the "Club") acted as agents of the Town of Amherst, in furtherance of the business, including law enforcement functions, of the Town of Amherst, and within the scope of their employment or agency with the Town of Amherst.

631. At all times relevant to this Complaint, Sedita, as the assistant district attorney who prosecuted Ms. Lynch, and District Attorneys Sedita and Flynn, who continued Ms. Lynch's malicious prosecution, wrongful conviction and wrongful incarceration, acted as employees and agents of the County of Erie, in furtherance of the business, including prosecutorial functions, of the County of Erie, and within the scope of their employment.

632. The conduct by which these agents committed the torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, negligence, and violation of the New York State Constitution was not undertaken for personal motives, but rather was undertaken while on duty, carrying out routine investigative and prosecutorial functions.

633.    Under the doctrine of *respondeat superior*, the Town of Amherst and the County of Erie are liable for their agents' state law torts of malicious prosecution, negligent hiring, training, retention, and supervision, intentional, reckless, or negligent infliction of emotional distress, negligence, and violation of the New York State Constitution.

## NINETEENTH CAUSE OF ACTION
*New York State Due Process Claim Pursuant to Respondeat Superior*
*Against Defendants Town of Amherst and County of Erie*

634.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

635.    The Individual Defendants, Frank Sedita III and John Flynn, by virtue of their acts and omissions detailed above, violated Lynch's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against her, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material; and (f) to not have *Brady* material that was suppressed pre-trial be continually suppressed throughout post-conviction proceedings.

636.    As a direct and proximate result of these individuals' acts and omissions, Lynch was wrongfully arrested, prosecuted, convicted, and imprisoned for 27 years, and suffered other grievous and continuing injuries set forth above.

637.    The Town of Amherst is liable under *respondeat superior* for the acts and omissions of the individual defendants, and the County of Erie under *respondeat superior* for the acts and omissions of Frank Sedita III and John Flynn, within the scope of their employment, for Lynch's damages.

115

638.   As a direct and proximate cause of these violations of Ms. Lynch's state constitutional due process rights by these individuals, Ms. Lynch suffered the damages and injuries set forth above.

**WHEREFORE**, Plaintiff Renay Lynch, prays for the following relief:

a.   That the Court award compensatory damages to her and against the defendants, jointly and severally, in an amount to be determined at trial;

b.   That the Court award punitive damages to her against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

c.   For a trial by jury;

d.   For pre-judgment and post-judgment interest and recovery of her costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.   For any and all other relief to which she may be entitled.

Dated:    New York, New York
          April 2, 2026

FISHER & BYRIALSEN PLLC
99 Park Avenue, PH Suite/ 26 Floor
New York, NY 10016
(303) 256-6345

/s/ Jane Fisher-Byrialsen
Jane Fisher-Byrialsen


BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH Suite/ 26 Floor
New York, NY 10016
(212) 490-0400

Luna Droubi
Marc Cannan
Karen Dippold
Tala Alfoqaha*

NEWIRTH LINEHAN PLLC
43 West 43rd Street, Suite 160
New York, NY 10036
(917) 426-5551

Karen A. Newirth
Charles F. Linehan


*Attorneys for Plaintiff Renay Lynch*